Charles H. VON STEIN,
Plaintiff–Appellee,

v.

George A. BRESCHER, et al.,
Defendants–Appellants.

No. 88–6136.

United States Court of Appeals,
Eleventh Circuit.

June 27, 1990.

Robert H. Schwartz, Gunther & Whitaker, P.A., Ft. Lauderdale, Fla., for defendants-appellants.

Bruce W. Jolly, Shailer, Purdy & Jolly, P.A., Ft. Lauderdale, Fla., for Grim, Berk and Carruthers.

Valerie Shea, Greer, Homer & Bonner, Miami, for plaintiff-appellee.

Before FAY and EDMONDSON, Circuit Judges and YOUNG *, Senior District Judge.

GEORGE C. YOUNG, Senior District Judge:

The former Sheriff of Broward County, Florida, George Brescher, and three Sher-

* Honorable George C. Young, Senior U.S. District Judge for the Middle District of Florida, sitting by designation.

iff's Deputies, Michael Berk, Kenneth Grimm, and Carl Carruthers, appeal monetary judgments rendered by the district court against them for acts committed by them within the scope of their discretionary authority.

The Plaintiff/Appellee in this case, Charles H. Von Stein, is President of Charles A. Von Stein, Inc. ["the company"], a family-run corporation specializing in commercial real estate and in the leasing, management and development of commercial properties. In the early 1980s, the company managed 16 or 17 properties which contained a total of approximately 420 commercial tenants. One of these properties was the Plaza Central Shopping Center.[1]

In June of 1983, Plaintiff was arrested for violation of section 796.06(1), Florida Statutes, which provides, in pertinent part:

[I]t shall be unlawful to let or rent any place, structure, or part thereof ... with the knowledge that such place ... will be used for the purpose of lewdness, assignation, or prostitution.

The charge against Plaintiff was based on allegations that on June 1, 1983, Plaintiff was leasing a unit in Plaza Central Shopping Center to "Man's World Culture Center" [hereinafter, "Man's World"] with the knowledge that such property was being used for prostitution. Plaintiff's arrest, including the following comment by George Brescher, who was then the Sheriff of Broward County, was publicized by the local media:

One of the big problems we think is getting to the right people. Traditionally, we've always just gone for the prostitute, but, behind every one you arrest is another to take their place so they go right back out on the street. Our feeling is we can get to the money behind them and put a hurt on them, that [sic] we can achieve some effective results.

The charge against Plaintiff was eventually nolle prossed by the State Attorney's Office. Subsequently, Plaintiff filed this action against Sheriff Brescher, as well as the three Sheriff's Deputies, who were all present at Plaintiff's arrest.

At the time of trial, the complaint contained two civil rights claims under Title 42, section 1983, which alleged that Plaintiff was illegally arrested and that Plaintiff was defamed by Sheriff's Brescher's statements to the media at the arrest scene. The complaint also included state law claims for false arrest, for malicious prosecution, and for intentional infliction of emotional distress. Plaintiff's theory at trial was that his arrest was staged as a media event in order to create favorable publicity for Defendant Brescher, who was running for re-election as Sheriff.

In a special interrogatory verdict, the jury found in favor of Plaintiff on all counts. Specifically, the jury found that the Defendants arrested Plaintiff without probable cause and that the Defendants' conduct in arresting Plaintiff was not protected by qualified immunity; that Defendant Brescher made a false statement concerning Plaintiff at the scene of Plaintiff's arrest which damaged Plaintiff's personal reputation and the reputation and goodwill of the company, and that Defendant Brescher was not protected by qualified immunity for such conduct; that the Defendants caused Plaintiff to be falsely arrested and imprisoned; that the Defendants maliciously instituted a criminal proceeding against Plaintiff; and that the Defendants intended to inflict emotional distress upon Plaintiff. The jury awarded Plaintiff compensatory damages of $550,000 and punitive damages of $230,000.[2] This appeal seeks review of the district court's order denying Defendants' post-trial motions.

## BACKGROUND

### The Criminal Case Against Plaintiff

The relevant facts of the case are largely undisputed. The Man's World lease called

1. The company also held a 16⅔ percent ownership interest in Plaza Central.

2. Compensatory damages were awarded jointly against all Defendants. Punitive damages were segregated by Defendant as follows: Brescher—$150,000; Grimm—$20,000; Carruthers—$40,000; and Berk—$20,000.

for the property to be used as "a cultural center for bridge, chess, backgammon, periodicals and newspapers, teaching of languages." The lease further provided: "It is understood and agreed that the demised premises shall be used only for those purposes expressly described above and that should the premises be put to any other use the Tenant shall be deemed to be in default of this lease agreement." The lease was for a five-year period with an option for another five years.

Plaintiff Charles Von Stein, a Fort Lauderdale businessman, has been active as an officer and employee of the company during the more than 25 years the company has been in business. Plaintiff came to believe in 1981 that prostitution was being conducted on the Man's World premises; however, no evidence suggested that Plaintiff knew that the property would be used for prostitution at the time he entered into the lease. Once Plaintiff realized that prostitution activities were occurring at Man's World, he asked Marylou Adams, a long-time broker-associate of the company who oversaw the leasing and management of Plaza Central Shopping Center, to contact the Sheriff's Department to see if it could help in getting rid of the tenant.

On July 10, 1981, and again on July 23, 1981, Marylou Adams contacted the Broward County Sheriff's Office regarding Plaintiff's concern that prostitution was occurring at Man's World. Adams spoke with Lieutenant Tom Slattery, who told her that the Sheriff's Department was aware that prostitution was occurring on the premises, that Man's World had been "busted" but Slattery was not aware if it had come to court yet, and that Man's World was a "slick" operation. Slattery advised Adams that the Sheriff's Department would keep her posted with respect to its Man's World investigation.

Ms. Adams also spoke on July 23 to an attorney, Richard Michelson, about Man's World. Michelson, who was also a tenant of Plaza Central Shopping Center, asked Adams to give Lieutenant Slattery Michelson's name and telephone number, which she did. On July 24, 1981, Slattery advised Adams that he had run a "make" on the woman who had signed the property lease on behalf of Man's World, and found that she had been arrested for loitering at a bar and had a history of prostitution.

On January 18, 1982, Adams spoke with Agent Michael Berk, a Defendant in this case, who had been assigned to the Man's World investigation.[3] Berk, a member of the Organized Crime Vice Unit of the Broward County Sheriff's Office, was the only officer assigned to the Man's World case during the last six months of 1982. During this conversation, Berk informed her that a man named Herman Schannault had been charged with running a house of prostitution in Fort Lauderdale. Berk stated that he would continue to accumulate evidence against Man's World and asked Adams to send him a list of tenants who would be willing to testify against Man's World. Other than this request, Berk did not ask that Adams take any action in relation to Man's World. Adams mailed Berk the requested list of tenants in January of 1982.

During the remainder of 1982, further contacts occurred between Ms. Adams and Berk. During one of these conversations, Berk assured her that the Sheriffs' Department was trying to get rid of Man's World but that it was difficult. During another conversation, Ms. Adams furnished Berk with information concerning the name on the Man's World lease, the use clause, the name of the Von Stein company, and the name of the owners of the shopping center.

In January of 1983, the company complied with a subpoena by producing a copy of the lease agreement, rent receipts, and a copy of the floor plan of the Man's World property. At about that time, Berk took the statements of Adams and Plaintiff concerning the activities at Man's World. From a photo line-up, Adams and Plaintiff identified Warren Inskeep, the man to whom the company had rented the property

3. Apparently, at this point, Lieutenant Slattery was no longer involved in the Man's World investigation.

which was being used as Man's World. Inskeep was the same person as Herman Schannault, who had been arrested for running a house of prostitution in Fort Lauderdale. The information supplied by Plaintiff and Adams, along with other information, was used by Berk in obtaining a capias for Schannault's arrest in February of 1983.[4] Again, in May of 1983, Berk used information provided by Plaintiff and Adams to establish probable cause for the arrest of Schannault.

On February 17, 1983, Adams received a telephone call from Berk in which Berk stated that he wished to inform Plaintiff that the Sheriff's Department had made an arrest for prostitution at Man's World that day and that a letter stating the same would be forthcoming. Berk advised Adams that this was the evidence the company needed to evict Man's World, that the Sheriff's Department had done their part and that the rest was up to the company.

On February 23, Berk telephoned Adams to advise that the company would be receiving a letter from Assistant State Attorney James Benjamin advising of forthcoming prostitution charges against Schannault. No mention of Section 796.06 was made in this letter, which was dated March 1, 1983. Adams discussed the letter with Plaintiff and, on March 4, sent a copy to attorney Michelson. Shortly thereafter, Michelson declined to take the eviction case for personal reasons.

In April of 1983, Adams called Detective Berk to tell him that Plaintiff felt they needed "stronger information," such as a conviction, in order to evict Man's World. Berk stated that he would send another letter to help with the Man's World eviction. On May 18, 1983, Berk and Defendant Kenneth Grimm [5] delivered a letter to Plaintiff which included a computer list of charges that had been filed relating to

Man's World and a copy of Section 796.06, Florida Statutes.

Early in 1983, Defendant Grimm had brought Section 796.06 to the attention of the Chief of the Organized Crime Section of the Broward State Attorney's Office, who informed Grimm that no case law existed on the statute. Assistant State Attorney Benjamin also discussed Section 796.06 with Grimm, who inquired whether the person that leased the premises to Man's World could be prosecuted successfully under Section 796.06. Benjamin advised Grimm that the lessor could be so prosecuted because Benjamin interpreted the statute to apply not only at the inception of the lease, but also to on-going lease relationships. After speaking with the Chief and Benjamin, Grimm formed the opinion that Section 796.06 applied to an on-going lease situation and that a prostitution conviction was not required in order for a landlord to be culpable under Section 796.06.

Upon receipt of the second letter, Plaintiff did not believe there was any urgency to act on his part; however, on May 18 he called attorney David Murray and asked him to take steps to evict Man's World. Plaintiff left for a vacation the following day and returned on May 31. The following day, Plaintiff received a telephone call from Grimm. Pursuant to Grimm's request, Plaintiff agreed to meet with Grimm at 2 p.m. Grimm asked Plaintiff during the meeting: "Is the [Man's World] lease still in effect?" When Plaintiff answered "yes," he was placed under arrest.[6]

Defendants Berk and Grimm testified that they believed probable cause existed to arrest Plaintiff for violation of Section 796.06 the day of the arrest, notwithstanding Plaintiff's cooperation with law enforcement. At the time of Plaintiff's ar-

---

**4.** Between April 15 and May 18, 1983, Plaintiff received two subpoenas to testify against Schannault. Plaintiff was prepared to respond to the subpoenas but the trial never occurred.

**5.** Beginning in January of 1983, Defendant Grimm was a detective assigned to the Organized Crime Division of the Sheriff's Department. At that time, only Grimm and Berk staffed that department. Grimm assisted in the writing of the second letter to Plaintiff.

**6.** In addition, prior to Plaintiff's arrest, officers had visited the Man's World property to confirm that the business was still in operation.

rest, Defendants Brescher and Carruthers[7] did not know of Plaintiff's cooperation with the Sheriff's Department, but each testified that such information would not have affected his decision that probable cause existed to arrest Plaintiff for violation of Section 796.06.

Mindy Solomon, the Assistant State Attorney who succeeded James Benjamin as Vice Unit prosecutor in 1983, prepared the information against Plaintiff. At that time, Solomon did not know that Plaintiff had participated in the photo line-up or that he and Adams had given sworn statements in connection with Schannault. Solomon testified, however, that this information would not have affected her determination that probable cause existed to arrest Plaintiff for violation of Section 796.06 because Plaintiff continued to lease the property after learning that prostitution was occurring on the premises. Solomon testified that she nolle prossed the case because Plaintiff agreed to testify in a felony case against Schannault and because Man's World was being closed down.

The case against Plaintiff was dismissed on August 24.

### Procedural History

This case was tried in August of 1987. At the close of Plaintiff's case, Defendants moved for a directed verdict on the grounds that probable cause for Plaintiff's arrest existed under Section 796.06 and that Defendants' conduct was objectively reasonable. The motion was denied. Both Plaintiff and Defendants moved for directed verdicts at the close of the evidence, and both motions were denied.

Prior to charging the jury, the district court ruled on three issues that had been previously briefed by the parties. First, the court rejected Plaintiff's contention that Plaintiff was categorically outside the scope of parties to whom section 796.06 applied by finding that the statute could apply to a landlord who does not know of an intended illegal purpose at the time of entering into the lease but who thereafter learns his tenant intends to use it for such

a purpose. Second, the district court ruled that Defendants' alleged violation of state law concerning warrants for misdemeanor offenses was of no consequence to Plaintiff's civil rights claim, and, third, that a defense of qualified immunity would not be vitiated by actual malice.

After entry of final judgment, Defendants filed a Motion for Judgment in Accordance with Directed Verdict, Motion for Judgment Notwithstanding the Verdict, and Motion for New Trial. In a lengthy order, the district court found as a matter of law that Defendants were not entitled to qualified immunity. *See Von Stein v. Brescher,* 696 F.Supp. 606 (S.D.Fla.1988). The district court was

> in unequivocal agreement with the interpretation advanced by the Defendants. They contended that [Section 796.06] would be violated *at any time* during the pendency of a lease so long as the lessor lets the place, with the knowledge that the place will *thereafter* be used for purposes of prostitution, assignment or lewdness. In short, we concluded, the statute proscribes certain conduct both at the time the lease is entered and at any time thereafter during the pendency of the lease so long as the lessor leases with "knowledge" that the place *will be* used for prostitution. So, to the extent it may be argued that the state of the law was unsettled at the time of the arrest, we have determined that the Defendants correctly anticipated the manner in which the law would be interpreted.

*Id.* at 612 (emphasis in original). The district court concluded, however, that the Defendants arrested Plaintiff without probable cause because, "given the information available to the Defendants[,] a reasonable officer would have known there was no probable cause to arrest the Plaintiff ... because the Plaintiff acted without the requisite 'knowledge' or *mens rea." Id.* In concluding that the Defendants lacked an objectively reasonable basis for arresting Plaintiff, the district court also found that the evidence supported Plaintiff's theory

---

7. Defendant Carruthers was Berk's and Grimm's superior.

that his arrest was staged for political impact.[8]

## REVIEW STANDARDS

■ This Court can reverse the jury's verdict if the district court erred in not granting Defendants' motions for a directed verdict and judgment notwithstanding the verdict. *Reimer v. Short*, 578 F.2d 621 (5th Cir.1978), *cert. denied*, 440 U.S. 947, 99 S.Ct. 1425, 59 L.Ed.2d 635 (1979). In determining whether the district court erred in denying Defendants' motions for directed verdict and judgment n.o.v., we apply the same standard as that applied by the district court. *Miles v. Tennessee River Pulp and Paper Co.*, 862 F.2d 1525, 1528 (11th Cir.1989). The standard for granting these motions was set out by the former Fifth Circuit in *Boeing Company v. Shipman*, 411 F.2d 365 (5th Cir.1969) (en banc):

> On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n.o.v. should not be decided by

which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question.

*Id.* at 374–75 (quoted in *Miles*, 862 F.2d at 1528).

## I. SECTION 1983 ILLEGAL ARREST CLAIM

Section 1983 provides a federal remedy for the deprivation of rights, privileges, or immunities protected by the Constitution or the laws of the United States. *Golden State Transit Corp. v. City of Los Angeles*, — U.S. —, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989). Under the Fourth Amendment, which is applicable to the States through the Fourteenth Amendment, persons have the right not to be arrested without probable cause. *Motes v. Myers*, 810 F.2d 1055 (11th Cir.1987). Violation of this right may give rise to a claim for damages pursuant to section 1983 of Title 42, United States Code. *Id.*

■ A law enforcement officer has probable cause to arrest a suspect if the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.[9] *United States v. Jimenez*, 780 F.2d 975 (11th Cir.1986); *United States v. Mastrangelo*, 733 F.2d 793 (11th Cir.1984). The existence of probable cause to arrest is based on objective standards. *United States v. Hastamorir*, 881 F.2d 1551 (11th Cir.1989).

■ Intertwined with the question of probable cause is the issue of qualified immunity. Under this doctrine, "govern-

---

**8.** The district court found that Plaintiff's theory was supported by Defendants' failure to obtain an arrest warrant, the notification of the media, Defendant Brescher's media statement, and the ultimate dismissal of the charges.

**9.** "Probable cause" defines a radically different standard than "beyond a reasonable doubt," and

while an arrest must stand on more than suspicion, the arresting officer need not have in hand evidence sufficient to obtain a conviction. *United States v. Pantojo–Soto*, 739 F.2d 1520 (11th Cir.1984), *cert. denied*, 470 U.S. 1008, 105 S.Ct. 1369, 84 L.Ed.2d 389 (1985).

ment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." [10] *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396, 410 (1982). "[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). The standard is an objective one, *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738, 73 L.Ed.2d at 410, and therefore does not include an inquiry into the officers' subjective intent or beliefs. *Anderson,* 483 U.S. at 639, 107 S.Ct. at 3038, 97 L.Ed.2d at 530. In sum, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271, 278 (1986).

■ In determining whether qualified immunity exists, the issue is "not probable cause in fact but 'arguable' probable cause." *Gorra v. Hanson,* 880 F.2d 95, 97 (8th Cir.1989) (quoting *Floyd v. Farrell,* 765 F.2d 1, 5 (1st Cir.1985)). Actual probable cause is not necessary for an arrest to be objectively reasonable. Indeed, "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and ... in such cases those officials ... should not be held personally liable." *Anderson,* 483 U.S. at 641, 107 S.Ct. at 3040, 97 L.Ed.2d at 531. *See Tillman v. Coley,* 886 F.2d 317 (11th Cir.1989) (recognizing that an officer who effects an arrest without probable cause may be protected by qualified immunity).

■ We find that, at the time Defendants arrested Plaintiff, the law was clearly established that an arrest without probable cause to believe a crime had been committed violated the Fourth Amendment. *See Herren v. Bowyer,* 850 F.2d 1543 (11th Cir.1988). Accordingly, applying the qualified immunity test in the context of Plaintiff's alleged unlawful arrest, we must determine whether reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest Plaintiff for violation of section 796.06. We find that a reasonable officer could have so believed.

The evidence indisputably revealed that Plaintiff knew prostitution was occurring at Man's World. In fact, Plaintiff testified that, at least by 1982, he had no doubt that prostitution was occurring at Man's World. Upon review of the record, we find that, in 1983, a reasonable law officer could have believed that Section 796.06 applied to a landlord who leases premises which were thereafter used for prostitution, if the landlord had knowledge of such use at any time during the term of the lease. The record reveals that such an interpretation was embraced not only by prosecutors Benjamin and Solomon, it was accepted by the district court below. While the district court avoided a finding of probable cause by construing Section 796.06 to require the element of *mens rea,* we find that reasonably competent persons could disagree on this interpretation of the statute. [11] In addition, the testimony established that, prior to the instant case, Section 796.06 had never been subject to judicial interpretation.

When there is no dispute about the material facts, the court has the duty to decide whether the defendants' conduct violated

---

10. "The doctrine [of qualified immunity] is intended to balance society's interest in providing a remedy for injured victims and discouraging unlawful conduct against the interest in enabling public officials to act independently without fear of consequences." *Waldrop v. Evans,* 871 F.2d 1030, 1033 (11th Cir.1989).

11. In so holding, we emphasize that we do not necessarily agree with the interpretation given Section 796.06 by the district court and by Assistant State Attorneys Benjamin and Solomon. Such an interpretation raises difficult questions as to scienter, as illustrated by the district court's attempts to grapple with this issue at trial.

clearly established law. *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Reasonable law enforcement officers, possessing the same knowledge and in the same circumstances as Defendants, could have believed that "arguable" probable cause existed for Plaintiff's arrest. For these reasons, we find that the district court erred in denying Defendants' motions for directed verdict and judgment n.o.v.

## II. SECTION 1983 "STIGMA PLUS" CLAIM

■ In his second claim under section 1983, Plaintiff asserts that Defendant Brescher, acting under color of state law, made defamatory statements to the media at the scene of Plaintiff's arrest which ultimately led to a deprivation of Plaintiff's property interest in the company's goodwill and reputation without due process of law. In addressing this issue, it is necessary to survey briefly the relevant law explicating the constitutional standards concerning defamation by public officials.

In *Wisconsin v. Constantineau*, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), the United States Supreme Court considered the constitutionality of a state statute that provided for the posting in liquor stores of a list of persons who tended to become violent after drinking and who were forbidden from purchasing alcohol for one year. The statute did not provide the persons listed with notice or opportunity for a hearing. Pursuant to this statute, a police chief caused to be posted a public notice forbidding sales or gifts of liquor to the plaintiff. Finding that the state had attached a "badge of infamy" to the plaintiff, the Supreme Court concluded that due process protections were required and that the statute was facially unconstitutional. The Court stated that "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." 400 U.S. at 437, 91 S.Ct. at 510, 27 L.Ed.2d at 519.

The following year, in *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the Supreme Court again grappled with the issue of determining to what extent defamation by a state official constitutes a constitutional deprivation. *Roth* involved a non-tenured teacher at a state university who was not rehired after his one-year contract expired. No reason was given for the university's decision not to re-hire the teacher. The Supreme Court held that the teacher had no property interest in his job because state law did not guarantee him a right to renew his contract.

In discussing whether the teacher in *Roth* had been deprived of a liberty interest, the Court noted that liberty, as protected by the Fourteenth Amendment, included a number of rights, including the right of the individual "to engage in any of the common occupations of life." 408 U.S. at 572, 92 S.Ct. at 2706, 33 L.Ed.2d at 558 (quoting *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923)). The Court stated that a liberty interest might exist under certain circumstances in a case "in which a State refused to reemploy a person," but that *Roth* did not present such a case. 408 U.S. at 573, 92 S.Ct. at 2707, 33 L.Ed.2d at 558. The Court suggested that its holding might be different "if the nonrenewal of [the teacher's] contract [was based] on a charge, for example, that he had been guilty of dishonesty, or immorality," *id.*, or if the State had otherwise "imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." 408 U.S. at 573, 92 S.Ct. at 2707, 33 L.Ed.2d at 559.

The Court again addressed the issue of governmental defamation in *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). In *Paul*, a police chief distributed flyers to retail stores with mug shots of persons considered to be "active shoplifters." The flyers contained the name and photograph of the *Paul* plaintiff, who had pled not guilty to a shoplifting charge but had not yet been tried. The plaintiff filed an action in federal court, contending that the flyers defamed him and that, under

*Constantineau,* he was entitled to due process. Plaintiff was not discharged from his employment as a newspaper photographer, but Plaintiff alleged that as a result of the flyers, he had received a warning from his employer and that his future employment opportunities would be seriously impaired. The Supreme Court found that the plaintiff had not been deprived of either a liberty or property interest that would trigger due process protections.

Notably, the Supreme Court in *Paul* expressed concern that the Fourteenth Amendment not be interpreted so as to make it "a font of tort law to be superimposed" upon a state whenever a state law official commits a tort. 424 U.S. at 701, 96 S.Ct. at 1160, 47 L.Ed.2d at 413. The Supreme Court stated that its prior cases dealing with stigma to reputation resulting from defamation by government officials did "not establish the proposition that reputation alone, apart from some more tangible interests such as employment, is either a 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." 424 U.S. at 701, 96 S.Ct. at 1160, 47 L.Ed.2d at 414.

In so stating, the Supreme Court noted that it had said in *Constantineau* that due process rights were triggered "[w]here a person's good name, reputation, honor, or integrity is at stake *because of what the government is doing to him.*" 424 U.S. at 708, 96 S.Ct. at 1164, 47 L.Ed.2d at 418 (quoting *Constantineau*) (emphasis supplied in *Paul*). The Court acknowledged that this statement was vague and could be read to significantly broaden its prior decisional law. Rather than interpreting *Constantineau* as a broadening of the law, however, the Court found that the italicized phrase "referred to the fact that governmental action taken in that case deprived the individual of a right previously held under state law—the right to purchase liquor in common with the rest of the citizenry." *Id.* Similarly, the Court said that, "[w]hile *Roth* recognized that governmen-

tal action defaming an individual in the course of declining to hire him could entitle the person to notice and an opportunity to be heard as to the defamation, its language is quite inconsistent with any notion that a defamation perpetrated by a government official but unconnected with a refusal to rehire would be actionable under the Fourteenth Amendment...." 424 U.S. at 709, 96 S.Ct. at 1164, 47 L.Ed.2d at 418. The Court quoted two other passages from *Roth,* twice emphasizing the phrase: *"in declining to rehire/reemploy the respondent."* 424 U.S. at 709, 96 S.Ct. at 1164, 47 L.Ed.2d at 419.

After reviewing *Constantineau, Roth,* and other relevant cases, the Supreme Court concluded that its prior decisions established "no constitutional doctrine converting every defamation by a public official into a deprivation of liberty within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." 424 U.S. at 702, 96 S.Ct. at 1161, 47 L.Ed.2d at 414. The Court found that in each of the cases, it was the significant alteration or extinguishment of a right or status recognized by state law which supported the invocation of the procedural guarantees contained in the Due Process Clause of the Fourteenth Amendment. The Supreme Court reasoned that, since the defendant state official had defamed the *Paul* plaintiff without depriving him of any right or status recognized by state law, the injury did not rise to the level of a constitutional deprivation.[12]

*Paul* has been widely construed as setting forth a "stigma-plus" test: to establish an interest sufficient to implicate Due Process safeguards, a person must be stigmatized in connection with a denial of a right or status previously recognized by state law. The quandary arises in determining precisely what is sufficient to satisfy the "plus" requirement. Other Circuit Courts have interpreted *Paul* to hold that governmental defamation, even if it leads

---

**12.** Subsequent to *Paul,* the United States Supreme Court made clear that an injury to reputation in connection with an official discharge from public employment is cognizable under federal law. *See Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980).

to a significant loss of employment opportunities, is not a deprivation of a liberty or property interest unless it occurs in the course of termination of employment, or in the significant alteration of some other legal right or status. *See, e.g., Neu v. Corcoran*, 869 F.2d 662 (2d Cir.) (where defamatory statements by state officials did not occur in the course of the plaintiff's dismissal from a government job or in the termination of any legal right or status enjoyed by the plaintiff under New York law, qualified immunity protected state officials from § 1983 action), *cert. denied*, —— U.S. ——, 110 S.Ct. 66, 107 L.Ed.2d 33 (1989); *Goulding v. Feinglass*, 811 F.2d 1099 (7th Cir.) (defamatory statements by I.R.S. employees did not deprive tax lawyer of liberty or property interest where lawyer was not foreclosed from practicing law, even if such comments made lawyer "less attractive to clients"), *cert. denied*, 482 U.S. 929, 107 S.Ct. 3215, 96 L.Ed.2d 701 (1987).

We do not think the law of this Circuit has established that defamation occurring other than in the course of dismissal from a job or in the termination or significant alteration of some other legal right or status will suffice to constitute a deprivation sufficient to state a claim under section 1983.

Plaintiff cites *Marrero v. City of Hialeah*, 625 F.2d 499 (5th Cir.1980), *cert. denied*, 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 337 (1981),[13] as authority for his "stigma-plus" claim. In *Marrero*, our predecessor court considered the district court's dismissal of a complaint brought under section 1983 which alleged in part that the plaintiffs had been "deprived of their right to earn a living" when the Hialeah Police Department, in connection with a state prosecutor, announced to the media that a large amount of stolen property had been recovered in a raid on a jewelry store owned by the plaintiffs. The police officers in that case had executed a warrant authorizing a search for stolen items in the store. After their search uncovered none of the items listed in the warrant, the police obtained several victims of local robberies

to assist in the identification of stolen items. Only one item, a bracelet, was identified as stolen. Nevertheless, the officers seized the entire stock of jewelry on the premises and arrested the plaintiffs for receipt of stolen property under Florida law.

At the time of the arrests, the Hialeah Police Department and a state prosecutor announced to the media that more than $75,000 in stolen property had been recovered in the raid and that plaintiffs had been arrested. Subsequently, the state court granted the plaintiffs' motion to suppress all of the seized evidence except the gold bracelet. The items were returned to the plaintiffs and, as of the date the plaintiffs filed their section 1983 complaint, no further action had been taken against them.

On appeal, the plaintiffs argued that the district court had improperly dismissed their complaint for failure to state a cause of action under section 1983. Our predecessor court agreed. In so holding, the former Fifth Circuit Court of Appeals found that *Paul* did not mandate the dismissal of the plaintiffs' claims of injury to their personal and business reputations because, "on at least four independent grounds," the plaintiffs' claims, unlike the claims in *Paul*, involved deprivations of constitutionally protected interests. *Id.* at 513. First, according to the Court, the plaintiffs could recover damages for injury to reputation caused by the illegal search and seizure. Second, to the extent the defamatory statements injured the plaintiffs' business goodwill without due process of law, the complaint stated a claim upon which relief could be granted. Third, to the extent the defamatory statements resulted in injury to the plaintiffs' "personal and/or business reputations and to their goodwill," the "stigma-plus" test was satisfied. *Id.* at 516. Finally, because the injury to the plaintiffs' reputation was "intimately connected with the unlawful arrest of [the plaintiffs] and the unlawful search and seizure of practically the entire inven-

---

**13.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this Circuit adopted as precedent all of the decisions of the

former Fifth Circuit decided prior to October 1, 1981.

tory of their store," the "stigma-plus" test was satisfied. *Id.* at 517.

In a subsequent case, *Bradford v. Bronner*, 665 F.2d 680 (5th Cir. Unit B 1982),[14] former members of the State of Alabama's capitol police force brought an action challenging their termination. One of the plaintiffs alleged that he had been stigmatized by his discharge and by derogatory comments made by one of the defendants to the press which implied that the plaintiff lacked the necessary qualifications for the position and was lazy. Citing *Paul,* the former Fifth Circuit Court of Appeals affirmed the district court's dismissal of the plaintiff's complaint. The Court distinguished *Marrero* on the basis that *Marrero* involved "a *significant* loss of business goodwill."[15] *Id.* at 683 (emphasis supplied).

More recently, in *Little v. City of North Miami*, 805 F.2d 962 (11th Cir.1986), this Court had occasion to consider whether a complaint alleging a section 1983 claim for deprivation of a liberty interest without due process was sufficient to withstand dismissal by the district court. The complaint, filed by a University of Florida law professor, alleged that the City Council of North Miami, without affording the professor notice or a hearing, passed a resolution which "embarrassed [the professor] in his personal life" and "[degraded] him in his employment." *Id.* at 969. *"Based upon the liberal principles of notice pleading,"* this Court concluded that the professor had "sufficiently alleged injury to his business reputation" under *Marrero* and *Paul* to withstand dismissal for failure to state a claim.[16] *Id.* (emphasis supplied).

Under the authority of *Paul,* we find that Plaintiff has not proved a federal cause of action actionable under section 1983. The *Marrero* decision does not compel us to find otherwise. As noted, *Marrero,* like *Little,* was decided at the "notice pleading" stage of proceedings. More importantly, the instant case is distinguishable from *Marrero* on its facts. While the defamatory statement in *Marrero* was made in connection with an illegal seizure, and therefore was clearly actionable under *Paul,* we have decided in this case that the Defendants in the instant case did not act unreasonably in arresting Plaintiff for violation of Section 796.06. In addition, the plaintiffs in *Marrero,* who were self-employed, had alleged that they were deprived of their right to earn a living by the state officials' defamatory statement. Such a claim is tantamount to a claim of defamation coupled with deprivation of employment, which precedent establishes is actionable under section 1983. Viewed in the light most favorable to Plaintiff, the evidence in the instant case established that Plaintiff suffered a temporary, partial loss of income as a result of Sheriff Brescher's statement.[17] No evidence suggested that the value of Plaintiff's company has been diminished.

As misleading as Defendant Brescher's media statement may have been, in light of *Paul,* we find that Defendant Brescher's statement did not extinguish or significantly alter any right guaranteed to Plaintiff

---

**14.** In *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir.1982), the Eleventh Circuit adopted as precedent all decisions of Unit B of the former Fifth Circuit.

**15.** The Court also distinguished *Dennis v. S & S Consolidated Rural High School District,* 577 F.2d 338 (5th Cir.1978, on the basis that, in *Dennis,* "the comments directly resulted in the plaintiff's loss of his job." *Bradford,* 665 F.2d at 683. *See Ray v. Tennessee Valley Authority,* 677 F.2d 818 (11th Cir.1982) (alleged defamation by TVA officer concerning "firing" of plaintiff which occurred six years after plaintiff's discharge did not give rise to a section 1983 action), *cert. denied,* 459 U.S. 1147, 103 S.Ct. 788, 74 L.Ed.2d 994 (1983).

**16.** *Marrero* has been cited by this Court in other cases for the proposition that Florida law recognizes business goodwill as an interest protectable under the strictures of section 1983. Like *Little* and *Marrero,* however, those cases reached us upon appeal of the district court's dismissal of the complaint. *See Economic Development Corp. of Dade County, Inc. v. Stierheim,* 782 F.2d 952 (11th Cir.1986); *Espanola Way v. Meyerson,* 690 F.2d 827 (11th Cir.1982), *cert. denied,* 460 U.S. 1039, 103 S.Ct. 1431, 75 L.Ed.2d 791 (1983).

**17.** Plaintiff testified that in 1981, his salary and bonus totalled $76,000; in 1982, $72,000; in 1983, $42,400; in 1984, $79,000, and in 1985, $80,150.

by the United States Constitution or by Florida law. Accordingly, Plaintiff alleged no state action sufficient to invoke the procedural guarantees contained in the Due Process Clause of the Fourteenth Amendment. For these reasons, we conclude that Defendant Brescher was not liable to Plaintiff under section 1983.[18] Thus, the district court erred in denying Defendants' motions for directed verdict and judgment n.o.v. on this claim.

## III. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

■ Plaintiff asserts that a finding of probable cause to arrest does not necessarily dispose of Plaintiff's claim for intentional infliction of emotional distress.[19] To establish this tort in Florida,

> the conduct as a matter of law must be so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency. However, the conduct is privileged and the actor is never liable where he does no more than insist upon his legal rights in a permissible way, even though the actor is well aware that such insistence is sure to cause emotional distress.

*Southland Corp. v. Bartsch*, 522 So.2d 1053, 1056 (Fla. 5th DCA), *review dismissed*, 531 So.2d 167 (Fla.1988) (quoting § 46(d), Restatement 2d of Torts (1965)); *see Metropolitan Life Insurance Co. v. McCarson*, 467 So.2d 277 (Fla.1985) (emotional distress claim arises when the defendant's conduct is so extreme and indecent as to be intolerable in a civilized community). In *Southland*, the mother of a six-year-old boy who had been caught stealing gum from a convenience store brought an action for malicious prosecution and intentional infliction of emotional distress against the convenience store, which had pressed charges against the boy. The Florida Fifth District Court of Appeal reversed the jury verdict in favor of the plaintiff. The court found that since the undisputed facts showed that probable cause existed as a matter of law, the trial court had erred in submitting the question of malicious prosecution to the jury. The court also held that the trial court erred in submitting the emotional distress claim to the jury, finding that the convenience store was privileged because it had done nothing more than assert its rights in a legally permissible way. According to the court, an actor is never liable "where he does no more than insist upon his legal rights in a permissible way," even though he knew such insistence would cause emotional distress. 522 So.2d at 1056.

While police officers may be held liable under Florida tort law "for extreme abuse of their position," *Dependable Life Insurance Co. v. Harris*, 510 So.2d 985, 988 n. 7 (Fla. 5th DCA 1987) (quoting Restatement 2d of Torts § 46(e)), we have found that Defendants did not act unreasonably in arresting Plaintiff for the alleged violation of section 796.06. Viewing the evidence in the light most favorable to Plaintiff, we conclude that a reasonable jury could not have found that Defendants' conduct was legally impermissible or was otherwise so extreme and indecent as to warrant tort damages under Florida law.[20] Accordingly, the district court erred in denying Defendants' motions for directed verdict and for judgment n.o.v. on the claim of emotional distress.

---

**18.** We need not consider whether Plaintiff proved a claim for defamation under Florida law. *See* note 20, *infra.*

**19.** The finding of probable cause does dispose of the two remaining state claims, however. Under Florida law, probable cause is an affirmative defense to a claim for false arrest and lack of probable cause is an element that must be established in a malicious prosecution case. *See Weissman v. K-Mart Corp.*, 396 So.2d 1164 (Fla. 3d DCA 1981).

**20.** The parties stipulated at trial that although Defendant Brescher was accountable for his statements to the media under civil rights law, he possessed immunity from a defamation action under Florida law. Pursuant to this stipulation, the jury was instructed that it could not consider the Sheriff's press statement in assessing his liability for intentional infliction of emotional distress.

## CONCLUSION

For the reasons expressed, the judgment of the district court in favor of Plaintiff is REVERSED.