**Belinda WHEELER, Individually and as Next Friend and Guardian to Larry Simmons, Jr., Randias Wilder, Larita Howard, Jeremy Wilder, Lamar Haywood, and Shelinda Haywood, Plaintiffs,**

v.

**The CITY OF MACON, James Avera, Chief of the Macon Police Department, Captain Henry Gibson, Detective Carolyn Glover, John Doe and Jane Doe, All Individually and in their Official Capacities, Defendants.**

No. Civ.A. 5:96–CV–434.

United States District Court,
M.D. Georgia,
Macon Division.

June 16, 1999.

Althea L. Buafo, Sumner E. Riddick, Jr., Macon, GA, for plaintiffs.

Duke R. Groover, Macon, GA, Denmark Groover, Jr., Macon, GA, Joan W. Harris, Macon, GA, for City of Macon, defendant.

O. Hale Almand, Jr., Macon, GA, Joel Andrew Howe, Macon, GA, for James Avera, Jr., defendant.

Thomas M. Jackson, Macon, GA, for Henry Gibson, defendant.

William P. Adams, Macon, GA, for Carolyn Glover, defendant.

## ORDER

LAWSON, District Judge.

### I. Procedural History

Plaintiffs filed suit against Defendants City of Macon and its Mayors David Carter and James Marshall, against its Chief of Police, James Avera, and police officers Captain Henry Gibson and Detective Carolyn Glover. She seeks relief under 42 U.S.C. § 1983, claiming her rights were violated under the Fourth, Fifth and Fourteenth Amendments of the United States Constitution because she was falsely imprisoned and because she was subject to unreasonable search and seizure. She also alleges various supplemental state law claims of defamation and intentional infliction of emotional distress, as well as certain claims on behalf of her six minor children. All parties in the case have moved for summary judgment.

### II. Facts[1]

On November 21, 1995, Defendant Detective Carolyn Glover ("Glover") obtained an arrest warrant for Dewayne Wheeler ("Dewayne") for the offense of statutory rape. At the time, Dewayne was the husband of Plaintiff Belinda Wheeler ("Ms. Wheeler"). Ms. Wheeler was a police officer with the Macon Police Department. Glover was the detective assigned to the case involving Dewayne and had conducted the investigation into the rape allegations.

The victim, Debra McCrary, had informed Glover that she and Dewayne had been having a sexual relationship since she was thirteen, which resulted in McCrary having a baby. The victim's grandmother, Betty McCrary, told Glover that Ms. Wheeler knew about the relationship and the baby but was reluctant to report her husband because it would hurt her reputation with the Macon Police Department. Ms. Wheeler testified that she had been told by several people of the relationship, that Dewayne denied it, and that she did not believe the allegations.

After obtaining the warrant for Dewayne's arrest, Glover proceeded that same day to Ms. Wheeler's home in Lizella, where Dewayne was living at the time. When Glover arrived she was informed by one of Ms. Wheeler's children that Dewayne had gone with Ms. Wheeler to the National Guard Armory, where she was on duty that evening. Glover arrived at the Armory at approximately 7:15 p.m. Dewayne was not there, but Glover spoke with Ms. Wheeler about the situation, showing her the warrant. According to Ms. Wheeler, she was then ordered to convince her husband to turn himself in to the police department. Ms. Wheeler asked Glover how she could be reached, and Glover told her to call her secretary, who would be available at the Detective Bureau until midnight. Glover was under the impression Ms. Wheeler would contact

1. These facts, which are taken from the depositions and pleadings, are undisputed unless otherwise noted and are viewed in the light most favorable to Plainifs.

her that evening after she had contacted her husband.

Ms. Wheeler testified that Dewayne had been at the Armory earlier in the evening, but she did not tell Glover. She also testified that she knew statutory rape was a serious felony, knew the child involved in the allegation and knew Dewayne was on probation for another felony.

Ms. Wheeler then left the Armory and drove to Dewayne's brother's home, where she thought Dewayne might be. When she arrived and found they were not there, she paged Dewayne's brother. Dewayne called her back at approximately 9:15 p.m. and then arrived at the house at approximately 9:30 p.m. After some conversation about the warrant, Dewayne agreed to turn himself in. He asked if he could go home and change clothes; she agreed, and they drove to their home in Lizella, arriving at approximately 10:00 p.m. After Dewayne made phone calls to relatives, they proceeded back to Macon. Dewayne asked her to take him by his brother's house. After they arrived there, Dewayne informed her that he was not going to turn himself in to the police. Unable to persuade him otherwise, Ms. Wheeler drove back home and later telephoned Dewayne. They talked until after midnight. Ms. Wheeler then went to sleep. She never contacted Glover or anyone else at the Police Department to inform them of what happened that evening.

The next morning Ms. Wheeler awoke at approximately 6:00 a.m. and readied her children for school. She still made no attempt to contact Glover or anyone else at the Police Department; she did, however, attempt to contact Dewayne at his brother's house. After getting her children off to school, she drove to the Macon Police Department Team II office with her son Larry. She then proceeded to the Bibb Law Enforcement Center ("LEC") and took a prisoner over to Magistrate Court to have a warrant signed.

After returning the prisoner to the LEC, Ms. Wheeler went back to the Team II office, picked up her son, and went to a car lot to help him pick out a car. She was there for approximately 45 minutes to one hour, during which time she attempted to call Dewayne. She never attempted to call the Police Department during this time.

At approximately 11:00 a.m., Ms. Wheeler attempted to contact Glover and eventually spoke with her on the telephone. Upon questioning by Glover, she said she did not know of Dewayne's whereabouts and offered no explanation of what had occurred the previous evening. Glover ordered her to the Police Department for an explanation of the situation. Once there, she was questioned about Dewayne's whereabouts, at which point she gave an accounting of what had occurred the night before. After Glover and Gibson both questioned her they reported to Deputy Chief Willie May, who then reported to Avera.

May testified that he gave Avera a "brief overview of what had taken place," including the fact that there had been no communication from Ms. Wheeler since the previous evening when she had been made aware of the warrant and was given some obligation to get her husband to turn himself in. Regarding his understanding of the conversation with May on November 21, Avera stated:

> The deputy chief said that Ms. Wheeler had made a request to bring her husband in and that request had been granted by the investigating officer. The investigating officer gave a specific time that she was going to bring her husband in. Chief May then said that time had passed and that she did not show and that he had information from a witness at the National Guard Armory that Ms. Wheeler was with her husband. They had made contact with her and she said that she hadn't seen him. And the deputy chief said that was not the truth.

(Avera Dep. at 27.)

Upon receiving the report, Avera told May he wanted Ms. Wheeler arrested. May suggested that they first conduct an internal investigation, but Avera refused.

He then instructed May to go to his office and wait, that he would get back in touch with him. He explained that he was not clear in his mind as to the ramifications of Ms. Wheeler's conduct as he understood it to be. He then spoke to District Attorney Charles Weston and was advised by Weston that "it was apparent to him that there had been a violation, and he gave me two code sections, one a felony, and one a misdemeanor." (Avera Dep. at 30.) Later in the day, Avera called May and gave him two criminal statutes under which Ms. Wheeler could be charged and ordered her arrested.[2]

According to May, Avera stated that he interpreted the situation in his own mind as a "hindering the apprehension" violation. Avera concluded the conversation by ordering May to give a media interview explaining the arrest. Avera stated that he did so after receiving an inquiry from a television station.

During the time in which May and Avera were discussing the situation and possible charges, Glover and Gibson continued the questioning. Ms. Wheeler eventually signed a waiver of counsel form and gave a typed statement. Glover and Gibson then met with May, who informed them that Avera had ordered the arrest. Ms. Wheeler was then arrested and booked before subsequently being released on her own recognizance. Subsequent to the arrest, May held a press conference discussing the matter. The charges were never pursued by the District Attorney's office.

### III. Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be entered in favor of the movant where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The initial burden is on the movant, who must show by reference to materials on file "that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991). Whether the movant or the non-movant has the burden of proof at trial, the Court must believe the evidence of the non-moving party and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505.

While the evidence and all factual inferences therefrom must be viewed by the court in the light most favorable to the party opposing the motion, the nonmovant cannot rest on his pleadings to present an issue of fact but must make a response to the motion by filing affidavits, depositions, or otherwise in order to persuade the court that there are genuine material facts present in the case which must be presented to a jury for resolution. *See Van T. Junkins & Assoc. v. U.S. Indus., Inc.*, 736 F.2d 656, 658 (11th Cir.1984). As to materiality, "the substantive law will identify which facts are material. Only disputes that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. For a question of fact to be "genuine," there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505. The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the

---

**2.** May testifies that Avera told him he was in District Attorney Charles Weston's office at the time of the call. Avera testifies he telephoned Weston and then called May from his own office with the information. Whichever is the case, it makes no substantive difference for purposes of this motion.

material facts," *Irby v. Bittick*, 44 F.3d 949, 953 (11th Cir.1995) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Only those doubts about facts that are reasonable must be resolved in favor of the nonmovant. *Irby*, 44 F.3d at 953.

## IV. Discussion

Plaintiffs have moved for summary judgment on several grounds. They contend qualified immunity is unavailable to the individual Defendants because their conduct violated clearly established constitutional rights of Ms. Wheeler, of which a reasonable person would have known. Additionally, Plaintiffs contend the City of Macon is liable for the actions of Defendant Avera, who acted as the policy maker for the Macon Police Department in disregarding established procedures and ordering Ms. Wheeler's unlawful arrest.

Each Defendant has moved for summary judgment as well. All Defendants contend the § 1983 claim should be dismissed because no underlying constitutional violation occurred since there was probable cause to arrest Wheeler. Alternatively, the individual Defendants assert the defense of qualified immunity. Finally, Defendant City of Macon contends that even if there was no probable cause to arrest, there is no evidence Wheeler was deprived of her constitutional rights pursuant to a municipal policy or custom. Because Defendants' motions for summary judgment are granted (and Plaintiffs' motion is necessarily denied) the Court will address each of Defendants' contentions in the order presented.

### A. Probable Cause

■ Liability under 42 U.S.C. § 1983 attaches only when an underlying constitutional right is violated. *City of Los Angeles v. Heller*, 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986). Plaintiff contends her Fourth Amendment rights were violated because she was subject to false arrest and detention. While a warrantless arrest without probable cause violates the Consti-

tution and forms the basis for a § 1983 claim, the existence of probable cause is an absolute bar to liability. *Marx v. Gumbinner*, 905 F.2d 1503, 1505 (11th Cir.1990).

■ The nebulous concept of probable cause "is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *McKenna v. County of Clayton*, 657 F.Supp. 221, 223 (N.D.Ga.1987) (citing *Illinois v. Gates*, 462 U.S. 213, 231–32, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). The Supreme Court of the United States has recognized that a test for probable cause cannot be formulated with precision. "In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). Given these considerations, courts must look to the "totality of the circumstances" in determining whether probable cause existed. *Gates*, 462 U.S. at 231–32, 103 S.Ct. 2317. Probable cause may be found when the circumstances allow a reasonably cautious person to conclude that an offense has been committed by the arrestee. *McKenna*, 657 F.Supp. at 223.

Courts considering Fourth Amendment issues are reluctant to second guess the seasoned judgment of a police officer, instead deferring to the practical realities of police work and the ability of skilled officers to detect criminal activity a layperson might not. *See generally Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). As a result, probable cause "can be based in large measure on the collective knowledge of an investigative unit or the evasive or irregular behavior of a suspect." *McKenna*, 657 F.Supp. at 223 (citing *United States v. Edwards*, 577 F.2d 883 (5th Cir.1978) and *United States v. Green*, 670 F.2d 1148 (D.C.Cir.1981)).

■ Applying the above-stated principles, the Court finds that the combination of Defendants' collective knowledge and Ms. Wheeler's irregular and evasive behavior was sufficient to establish probable cause to arrest Ms. Wheeler for hindering the apprehension of a criminal, as defined under Georgia law:

(a) A person commits the offense of hindering the apprehension or punishment of a criminal when, with intention to hinder the apprehension or punishment of a person whom he knows or has a reasonable grounds to believe has committed a felony ... he:

(1) Harbors or conceals such person; or

(2) Conceals or destroys evidence of the crime.

O.C.G.A. § 16–10–50 (1996).

Ms. Wheeler knew or had reasonable grounds to believe Dewayne had committed a felony. At the time Ms. Wheeler was first approached by Glover she was made aware of the warrant. She also testified that she had been previously told by several people of the alleged unlawful sexual relationship between Dewayne and the minor. She also knew Dewayne was on probation for a previous felony.

There is also sufficient evidence to suggest she harbored or concealed Dewayne with the intention of hindering his apprehension. Dewayne had been at the Armory earlier in the evening on the night of November 21, yet Ms. Wheeler did not inform Glover of this in response to her questions about Dewayne's whereabouts, apparently unaware that one of her own children had told Glover that Dewayne had gone to the Armory with Ms. Wheeler. Instead, Ms. Wheeler was evasive with her answers, telling Glover she did not know where Dewayne was and that he usually left the house when she left to go to work.

According to Ms. Wheeler, Glover then asked Ms. Wheeler if she could get Dewayne to turn himself in. Ms. Wheeler replied that she felt she could and said she would leave to search for him as soon as Glover left. Ms. Wheeler then asked Glover how she could get in touch with her;

Glover told her to contact her secretary, who would be available until 12:00 a.m. Ms. Wheeler was shortly able to get in touch with her husband and tried unsuccessfully for several hours to convince him to turn himself in. She ultimately went to bed some time after midnight without success. She never contacted Glover or anyone else at the Department at any time that night, although Glover was under the impression she would and was expecting her call.

Wheeler got up early the next day, got her children off to school, went to work to perform a previously scheduled prisoner transfer, and then went with her son to a car dealership to purchase a car. She never attempted to contact Glover or anyone with the Department during this time (although she did attempt to call Dewayne, whom she was unable to reach). Around 11:00 that morning she contacted Glover, some fourteen hours after first informing Dewayne of the warrant for his arrest, giving him a very generous head start in evading apprehension. Her conduct over the course of these events establishes probable cause for a reasonably prudent officer to conclude that she intended to hinder Dewayne's apprehension.

Plaintiffs' arguments that no probable cause existed are unpersuasive. First, Plaintiff places much emphasis on the suggestion of May (who is not a party to this lawsuit) to Avera that the matter be turned over to internal affairs for investigation, as opposed to arresting Ms. Wheeler. Plaintiffs contend that because May testified this was the normal procedure and that an arrest without first conducting an internal investigation would be rash, the arrest was *ipso facto* without probable cause because Avera could not have believed probable cause existed in light of May's advise and opinion.

The Court cannot agree with this argument. Whether probable cause to arrest existed is an analysis independent of May's opinion and advice to Avera. Avera was May's superior and the Chief of the Department: he was not accountable to May

for his decisions. More importantly, Ms. Wheeler's conduct is subject to the same analysis and standards as any other citizen who may be in violation of the law. She has no constitutional right to an internal investigation prior to arrest, nor is she entitled to a consensus on probable cause among members of the police department.

Plaintiff also contends the deposition testimony of Defendants Glover and Gibson suggest that neither believed there was probable cause to arrest. This is not the Court's understanding of their testimony. Defendant Gibson testified that he did not agree with the decision to arrest Ms. Wheeler at that time; however, he stated that he did not think the arrest was illegal or against departmental procedures. He also detailed the circumstances he felt established probable cause. Defendant Glover recited in great detail the facts from the report of her interview which she felt established probable cause, all of which dealt with Ms. Wheeler's evasiveness in providing information and answering questions. More importantly, the existence of probable cause is based on an objective review of the facts and circumstances. The fact that Glover or Gibson may have chosen not to arrest at that time, had the decision been theirs to make, is of no importance. They received an order to arrest based on information they had provided and they effectuated the arrest pursuant to that order. The information they provided was, in the opinion of Chief Avera and this Court, sufficient to establish probable cause.

## B. Qualified Immunity

■ Even if the Court were to find there was no probable cause to arrest Ms. Wheeler, the individual Defendants in this case would be entitled to qualified immunity. Under this doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73

L.Ed.2d 396 (1982). "For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law *in the circumstances.*" *Lassiter v. Alabama A & M Univ.,* 28 F.3d 1146, 1150 (11th Cir.1994) (en banc); *see also Ensley v. Soper,* 142 F.3d 1402, 1406 (11th Cir.1998) ("Any case law that a plaintiff relies upon to show that a government official has violated a clearly established right must predate the officer's alleged improper conduct, involve materially similar facts, and 'truly compel' the conclusion that the plaintiff had a right under federal law.")

■ "In determining whether qualified immunity exists within the context of a wrongful arrest claim, the issue is 'not probable cause in fact but "arguable" probable cause.'" *Von Stein v. Brescher,* 904 F.2d 572, 579 (11th Cir.1990) (quoting *Gorra v. Hanson,* 880 F.2d 95, 97 (8th Cir. 1989)). At the time Ms. Wheeler was arrested, "the law was clearly established that an arrest without probable cause to believe a crime had been committed violated the Fourth Amendment." *Von Stein,* 904 F.2d at 579 (citing *Herren v. Bowyer,* 850 F.2d 1543 (11th Cir.1988)). The issue then, in determining whether there was arguable probable cause, is "whether reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed." *Von Stein,* 904 F.2d at 579.

Chief Avera was informed by May of the events leading up to the arrest. He knew Ms. Wheeler was told to report to Glover by 12:00 a.m. on the night of November 21 and did not do so. He was informed that she had been evasive in accounting for the whereabouts of her husband. He also recounted the story to District Attorney Weston, who not only agreed that probable cause existed but also gave Chief Avera

two statutes which he felt Ms. Wheeler had arguably violated.

Detective Glover questioned Ms. Wheeler at the Armory and received answers she knew were evasive, based on what she had been told by Ms. Wheeler's children. She also understood that Ms. Wheeler would contact her later that evening and in fact was waiting on her call, which never came. Finally, she questioned Ms. Wheeler about the incident the next day after she finally called the police department. She felt her answers were untruthful, her story lacked credibility and that probable cause existed.

Captain Gibson was aware of what had transpired between Ms. Wheeler and Detective Glover, as Glover was regularly reporting to him on the matter. He testified in his deposition that he, too, felt probable cause existed in light of Ms. Wheeler's untruthfulness and failure to contact the police after she left her husband that night, knowing he did not intend to turn himself in. The Court finds that the knowledge of Defendants, both individually and collectively, supports a finding of arguable probable cause, and that the individual Defendants are entitled to qualified immunity.

### C. Municipal Liability

Under limited circumstances, a municipality may be considered a "person" and sued under 42 U.S.C. § 1983. However, liability is not based on a *respondeat superior* theory, but may be found only when the constitutional violation is the result of a custom or policy of the local government entity. *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Plaintiffs contend the City of Macon is liable for Ms. Wheeler's wrongful arrest because Defendant Avera, acting as the highest ranking official within the police department, was in fact a policy maker who ordered the arrest.

### 1. Policy

A municipality may be liable for a constitutional violation by one of its employees when the offending official is a policy maker to whom the local government has delegated policymaking authority. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). In the context of Ms. Wheeler's wrongful arrest claim, the question then is whether Chief Avera had authority to make final policy for the City of Macon with respect to arrests, or whether his ordering of Ms. Wheeler's arrest was merely conduct outside the scope of established procedures and guidelines establishing probable cause to arrest. In other words, is the City "at fault for what happened, or is this a case where the City could not have done anything to prevent the harm that occurred?" *Adamson v. Volkmer*, 680 F.Supp. 1191, 1197 (N.D.Ill. 1987). In making this determination, which is a question of law, the Court must look to state law, as well as local ordinances and regulations. *Praprotnik*, 485 U.S. at 125, 108 S.Ct. 915.

Law enforcement officers are granted the power of arrest under state law. *See* O.C.G.A. § 17–4–20 (1996). Guidelines for making an arrest are prescribed by the Fourth Amendment to the United States Constitution, and both the United States and Georgia Constitutions require that an arrest be made only when there is probable cause to believe that a criminal offense has been committed. As the City of Macon is a creation of the Georgia Legislature, *see* O.C.G.A. § 36–34–1, it has no individual authority to establish policy in the area of arrest and probable cause.

However, even if the City could be said to have created a policy for arresting or investigating officers thought to be involved in illegal conduct, it is clear that Chief Avera could not establish final policy in this area. The position of Chief of Police for the City of Macon is created by ordinance. The Chief is vested with supervision and control of the department, subject to direction of the mayor. *See*

Macon Municipal Code § 2–516. The Chief has the duty to "enforce all regulations of the department and administrative directives of the mayor." Macon Municipal Code § 2–517(2). While the Chief may propose regulations to organize and operate the department, these regulations shall become effective only after approval by the mayor and city council. Macon Municipal Code § 2–267.

Finally, Plaintiffs' contention that Chief Avera had authority to establish policy with regard to arrest procedures is undermined by their own arguments. "Defendant Avera gave the order to arrest Plaintiff Wheeler. At the time, there was no probable cause to arrest Plaintiff for the offense of 'Hindering the Apprehension of a Felon.' Defendant Avera refused to follow the normal procedures of turning the investigation of Plaintiff Wheeler over to Internal Affairs, and instead ordered the immediate arrest of Plaintiff Wheeler." (Pls' Br.Supp.Mot.Summ.J., at 9). Plaintiffs concede that a policy was in place and that Chief Avera chose not to follow that policy. It cannot be said that Chief Avera's single decision to act contrary to policy in effect established a new policy. Chief Avera's actions did not establish policy for the City of Macon.

### 2. Custom

██ A municipality may also be held liable if the conduct at issue reflects a practice "so permanent and well settled as to constitute a custom or usage with the force of law." *Monell,* 436 U.S. at 691, 98 S.Ct. 2018. In this case, there would need to be evidence suggesting Chief Avera had repeatedly ignored policy in similar situations in the past and "City officials failed to redress the problem of which they were aware; in such a case the ultimate policymakers would be sanctioning such conduct, in effect making that conduct the policy of the City itself." *Adamson,* 680 F.Supp. at 1198 (citing *Monell,* 436 U.S. at 691 n. 56, 98 S.Ct. 2018). Plaintiffs cannot make such a showing, as Ms. Wheeler concedes in her deposition testimony. (Wheeler dep. at 106–08, 111–18.)

### D. Remaining Claims

██ Plaintiffs' remaining claims of defamation and intentional infliction of emotional distress are state law claims before this Court based on supplemental jurisdiction. Pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to exercise supplemental jurisdiction over these claims because all claims over which the Court has original jurisdiction have now been dismissed.

### E. Conclusion

Defendants' Motions for Summary Judgment are hereby **GRANTED** with respect to Plaintiffs' claims under § 1983 and the Fourth, Fifth and Fourteenth Amendments to the Constitution. The Court declines to exercise jurisdiction with respect to Plaintiffs' supplemental claims. This case is **DISMISSED.**

**SO ORDERED.**