958 F.2d 1565
 Allan LOWE, Peggy Lowe, Patsy Smith, Irvin Smith, Plaintiffs-Appellees,
v.
Nancy ALDRIDGE, Defendant-Appellant,
James Davis, Defendant-Appellant,
Victoria Karp, Victoria Lowe, Defendants,
Sharon Moody, Defendant-Appellant,
Cobb County Georgia, Defendant.
William Howard OAKES, Anne M. Oakes,
Plaintiffs-Counter-Defendants, Appellees,
v.
James E. DAVIS, Nancy Aldridge,
Defendants-Counter-Claimants, Appellants,
Sharon Moody, Defendant-Appellant,
Cobb County, Georgia, Defendant.
 Nos. 91-8287, 91-8418.
 United States Court of Appeals,
Eleventh Circuit.
 April 27, 1992.
 
 Robert F. Webb, Webb, Casey & Gilson, Kris Skaar, Marietta, Ga., for Moody and Davis in No. 91-8287.
 Andrew R. Kirschner, Bedford, Kirschner & Venker, P.C., Atlanta, Ga., for Aldridge.
 Alan R. Turem, Turem & Edwards, Atlanta, Ga., for amicus curiae Georgia Council on Child Abuse.
 Robert E. Wilson, Dist. Atty., Decatur, Ga., for amicus curiae, Dist. Attys. for the State of Ga.
 Joseph P. Quirk, Quirk & Ashenden, Atlanta, Ga., for plaintiffs-appellees in No. 91-8287.
 George M. Weaver, England, Weaver & Kytle, Atlanta, Ga., for defendant Victoria Karp.
 Robert F. Webb, Webb, Casey & Gilson, Kris Skaar, Matthew D. Williams, Marietta, Ga., for Davis and Moody in No. 91-8418.
 Harvey D. Harkness, Awtrey & Parker, Marietta, Ga., for plaintiffs-counter-defendants-appellees in No. 91-8418.
 Appeals from the United States District Court for the Northern District of Georgia.
 Before KRAVITCH, ANDERSON and BIRCH, Circuit Judges.
 KRAVITCH, Circuit Judge:
 
 
 1
 Defendants-Appellants James Davis and Sharon Moody, Cobb County Police Officers; and Nancy Aldridge, a psychotherapist in private practice ("Defendants"), appeal from a district court denial of their motion for summary judgment against two sets of plaintiffs in two related cases: Allan Lowe, Peggy Lowe, Patsy Smith and Irvin Smith ("Lowe Plaintiffs"), and William and Anne Oakes ("Oakes Plaintiffs"). The Oakes Plaintiffs and Lowe Plaintiffs sued for damages under 42 U.S.C. § 1983 for alleged violation of the plaintiffs' Fourth Amendment right to be free from unreasonable search and seizure. We conclude that Defendants Davis and Moody were entitled to qualified immunity as a matter of law, and that there is no factual or legal basis for finding that Defendant Aldridge was acting under color of state law. We therefore REVERSE the judgment of the district court and REMAND with instructions to grant summary judgment for the defendants.
 
 I. BACKGROUND
 
 2
 These consolidated lawsuits arise out of a search of the homes owned by William and Anne Oakes, and Patsy and Irvin Smith, on May 1, 1987, pursuant to a search warrant obtained by Detective James Davis based on the allegations made during 1986 and 1987 by then-seven-year-old Alicia Lowe. Alicia Lowe claimed that her father, Allan Lowe; her grandmother, Peggy Lowe; and her great-aunt, Patsy Smith, had sexually abused Alicia and her two brothers, Garrick (Gary) and Darrell, at Patsy and Irvin Smith's home and the Oakes' home, both located in Marietta, Georgia.[1] The search of both the Smith home and the Oakes home revealed no evidence of the abuse and rituals described by Alicia. A grand jury returned a no-bill on the charges of sexual abuse brought against Allan and Peggy Lowe, and Patsy Smith; no charges were ever brought against the Oakes or Irvin Smith. The Oakes Plaintiffs subsequently brought suit against Cobb County, Detective James Davis, Major (then Captain) Sharon Moody, and Nancy Aldridge (Alicia's therapist) under 42 U.S.C. § 1983 for damages arising from the alleged violation of their Fourth Amendment right to be free from unreasonable search and seizure. The Lowe Plaintiffs[2] filed an identical suit against the same defendants.[3] All four defendants moved for summary judgment against the Lowe and Oakes Plaintiffs on the basis of qualified immunity. The district court granted the motion as to Cobb County, but denied the motions as to the individual defendants. Defendants filed this appeal.
 
 II. FACTS
 
 3
 On August 4, 1986, Victoria Lowe separated from her husband, Plaintiff Allan Lowe, because she suspected him of sexually molesting their then-six-year-old daughter, Alicia. Victoria Lowe filed for divorce on August 27, 1986, and took Alicia to Dr. Robert Manis, a child psychiatrist at Emory University, on September 15, 1986, for a psychiatric evaluation. Dr. Manis concluded that there was no evidence of sexual abuse.
 
 
 4
 During September of 1986, Victoria Lowe telephoned the Cobb County District Attorney's Office and relayed her suspicions that Alicia had been sexually abused. Assistant District Attorney Nicolette Templar suggested that Nancy Aldridge, a licensed therapist in private practice, might be able to help Alicia. Templar knew that Aldridge previously had testified in custody cases and cases involving child sexual abuse, but at no time did Aldridge have any formal connection with the Cobb County District Attorney's Office or any other governmental entity.
 
 
 5
 Nancy Aldridge met with Alicia Lowe on October 14, 1986, interviewed her, and concluded that the child had been the victim of sexual abuse by her father, Allan Lowe. Aldridge then called the Cobb County Department of Family and Children's Services to confirm that Victoria Lowe had reported her suspicions of child abuse. When Aldridge questioned Alicia as to why she had not told Dr. Manis about the abuse, Alicia told her that Dr. Manis was a man and that she was afraid of him.
 
 
 6
 Aldridge testified at a temporary custody hearing on October 21, 1986, and recommended that Victoria Lowe be given custody of the four children; the court agreed and denied Allan Lowe visitation rights. Aldridge treated Alicia again on October 27, 1986, and began seeing Alicia's brothers, Gary and Darrell, in December of 1986.[4] Although all three initially denied being abused, they soon reported ritualistic abuse at the Smith home involving Allan Lowe (their father), Peggy Lowe (their paternal grandmother), and Patsy Smith (their paternal great-aunt), as well as other adults they did not know. The descriptions offered by all of the children were excruciatingly detailed. Alicia used anatomically correct dolls to demonstrate how she had been sexually assaulted, and all three children told Aldridge and Detective Davis that they had been orally and anally sodomized, that animals and humans had been sacrificed during satanic rituals, and that their abuse had been videotaped.
 
 
 7
 Aldridge told Victoria Lowe that the exacting detail with which the children recounted their abuse made their stories generally credible, although some parts of their report seemed fantastic and, in some cases, impossible.
 
 
 8
 Victoria Lowe continued to seek prosecution of Allan Lowe for child abuse, but her requests that he be arrested were refused. She then sought an arrest warrant in the City of Alpharetta and succeeded in having Allan Lowe arrested in Roswell by the Alpharetta Police Department in October of 1986. The charges were dismissed, however, because Alpharetta is located in Fulton County and the criminal acts were alleged to have occurred in Cobb County.
 
 
 9
 On January 13, 1987, Dr. James Stark examined the three children at Nancy Aldridge's request. Dr. Stark concluded that Gary had been sexually victimized by his father and paternal grandmother, and that Alicia had been sexually victimized by her father.
 
 
 10
 Victoria Lowe contacted Detective James Davis of the Cobb County Police Department on March 24, 1987, and reported the children's stories of abuse, Dr. Stark's conclusions, and Aldridge's opinion regarding the children's credibility. Mrs. Lowe told Detective Davis that she had reported her suspicions to other police authorities, but that they had not followed up on her allegations. Detective Davis then contacted Aldridge, who reported that the children had initially denied being molested but, over time, had reported progressively more horrible accounts of abuse. On April 6, 1987, Detective Davis interviewed Alicia and Gary separately to confirm their stories. At Detective Davis' suggestion, Aldridge was present at the interview.
 
 
 11
 Alicia told Detective Davis that her father, grandmother, and great-aunt had taken her to a "house store" where pornographic materials were traded, and that she and her brothers had been repeatedly abused. Although she did not know the people who owned the "house store," Alicia offered to direct Detective Davis to its location. In his deposition, Detective Davis stated that Alicia was in the back seat of his car and gave very specific and precise directions to the house. Victoria Lowe, who was also in the car, asked Alicia once if she was sure about the directions, at which point Detective Davis reminded her not to help Alicia. Alicia eventually directed Detective Davis to 185 Sentinel Place in Marietta, Georgia, where she identified the grey house as the "house store" and the site of her abuse. Detective Davis subsequently determined that the house belonged to William and Anne Oakes.
 
 
 12
 Detective Davis had the children examined by Dr. Sally Marcus on April 22, 1987. Dr. Marcus found that Alicia had "a enlarged vaginal introitus" that was consistent with her account of abuse, but found no evidence of abuse of Gary. Another doctor, E. Earl Pennington, found no evidence of abnormality with respect to Darrell.
 
 
 13
 On April 29, 1987, Detective Davis, under the supervision of Major Moody, presented a sworn affidavit to the Cobb County State Court detailing the Lowe children's reports of abuse and the investigation Detective Davis had undertaken to confirm their story, and requesting a warrant to search the homes of Patsy and Irvin Smith and William and Anne Oakes. The court issued warrants for the arrest of Allan Lowe, Peggy Lowe, and Patsy Smith, and for the search of the Smith and Oakes houses. The two homes were searched at or around midnight on May 1, 1987, but the "no-knock" provisions were not used in either search. No evidence of any sexual abuse or any other ritualistic or satanic activity was found in either the Smith or the Oakes home. It is undisputed that until the moment of the search the Oakes had no knowledge of the allegations made against them, and had never met Allan or Victoria Lowe or their children.
 
 
 14
 No charges were ever filed against William or Anne Oakes; they subsequently filed suit in federal court on April 18, 1988, under 42 U.S.C. § 1983. A grand jury was convened in Cobb County to consider criminal charges against Allan and Peggy Lowe, and Irvin and Patsy Smith; a "no-bill" was returned as to all of the parties in July of 1988.[5] On September 19, 1988, the Lowe Plaintiffs also filed suit in United States District Court under section 1983.
 
 
 15
 III. PLAINTIFFS' CLAIMS UNDER 42 U.S.C. § 1983
 
 
 16
 Section 1983 affords relief for individuals who have been deprived of a constitutional right by an individual who was acting under color of state law. Flagg Brothers, Inc. v. Brooks, 436 U.S. 149, 156-57, 98 S.Ct. 1729, 1733-34, 56 L.Ed.2d 185 (1978). The plaintiffs alleged that Nancy Aldridge, Detective James Davis, and Major Sharon Moody acted under color of state law to deprive the Oakes, the Lowes, and the Smiths of their Fourth Amendment right to be free from unreasonable search and seizure because the police officers and Nancy Aldridge, who allegedly acted in concert with the officers, searched their homes without probable cause.
 
 A. Summary Judgment Generally
 
 17
 According to Celotex v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986), the party moving for summary judgment must demonstrate that the non-moving party lacks evidence to support an essential element of its claim. In order to survive the motion, the non-moving party must demonstrate that there is "evidence from which a jury might return a verdict in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).
 
 
 18
 To survive a motion for summary judgment, a plaintiff must at least establish the necessary elements of his or her cause of action and demonstrate the presence of genuine issues of material fact. For the purpose of this appeal from the denial of summary judgment on the grounds of immunity, "we assume the facts to be as the plaintiff states them and then determine the purely legal issue of whether those facts show a violation of clearly established rights of which a reasonable official in defendant's circumstances would have known." McDaniel v. Woodard, 886 F.2d 311, 313 (11th Cir.1989).
 
 
 19
 We review the district court's denial of the defendants' motions for summary judgment de novo. Id. For the reasons discussed below, we hold that the trial court misapplied the legal standards governing claims under section 1983 and that the defendants are entitled to summary judgment because 1) plaintiffs have not defeated the claim of qualified immunity of Defendants Moody and Davis, and 2) plaintiffs have not established that Defendant Aldridge acted under color of state law.
 
 
 20
 B. Defendants Davis' and Moody's Defense of Qualified Immunity
 
 
 21
 There is no dispute as to the facts in the possession of Detective Davis and Major Moody at the time of the issuance of the search warrants. Thus, if the facts as known to them constituted arguable probable cause, then summary judgment on the ground of qualified immunity is proper. Marx v. Gumbinner, 905 F.2d 1503, 1506 (11th Cir.1990).
 
 
 22
 The Supreme Court has held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). This circuit follows a two-step analysis:
 
 
 23
 1. The defendant public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. Rich v. Dollar, 841 F.2d 1558, 1563 (11th Cir.1988). The trial court found that the police officers were within their discretionary authority; neither party disputes this conclusion.
 
 
 24
 2. Once the defendant public official satisfies his burden of moving forward with the evidence, the burden shifts to the plaintiff to show lack of good faith on the defendant's part. This burden is met by proof demonstrating that the defendant public official's actions "violated clearly established constitutional law." Id. at 1564.
 
 
 25
 In order for a right to be clearly established and defeat an official's claim to qualified immunity,
 
 
 26
 [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law the unlawfulness must be apparent.
 
 
 27
 Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Indubitably, an arrest without probable cause violates the Fourth Amendment and establishes a cause of action under section 1983. See Marx v. Gumbinner, 905 F.2d at 1504. The question here is whether the police officers had arguable probable cause, or whether "reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed." Von Stein v. Brescher, 904 F.2d 572, 579 (11th Cir.1990). In other words, "actual probable cause is not necessary for an arrest to be objectively reasonable." Id. As the Supreme Court held in Malley v. Briggs, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), "[o]nly where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable will the shield of immunity be lost." Id. at 344-45, 106 S.Ct. at 1098 (citation omitted). We therefore review the evidence known to Davis and Moody with an eye to whether any reasonable officer would have sought arrest and search warrants based on that information.
 
 
 28
 The essence of plaintiffs' complaint is that Detective Davis relied on stale evidence and failed to advise the court issuing the warrant that other doctors had examined the children and had not concluded that they had been abused. The district court held that Moody and Davis were not entitled to qualified immunity because of "the ambiguous nature of the corroborating evidence, the ignorance of substantial exculpatory information by the defendants, and the staleness, and consequent suspect veracity, of the allegations in the instant case." Lowe v. Aldridge, No. 1:88-cv-2087-JTC (N.D.Ga.), March 1, 1991, at 14.[6] Even by the district court's own account of the facts, however, there was no "exculpatory evidence," only conflicting evidence by a number of qualified doctors as to whether or not there was physical evidence of sexual abuse. Only Dr. Manis, who had limited experience with child sexual abuse victims, came to the conclusion that no abuse had occurred. In order to establish probable cause, Detective Davis did not need to prove guilt or even to establish a prima facie case; he was required to show only that he had reason to believe that a crime had been committed and that evidence would be found at the premises to be searched. See Von Stein v. Brescher, 904 F.2d at 578-79. This standard was more than satisfied by the evidence presented to the Magistrate and the existence of a dissenting opinion does not negate the probativeness of the incriminating evidence.
 
 
 29
 Detective Davis and Major Moody prepared an affidavit in support of arrest and search warrants based on the repeated, detailed, and explicit statements of three children that they had been ritualistically sexually abused by their father, grandmother, and great-aunt. There is no basis for holding that police officers cannot depend on the uncorroborated evidence of a child victim of sexual abuse for the request for a warrant. On the contrary, this court recently refused to hold police defendants liable for "placing a reasonable amount of trust in the truth of" the statements of "an injured and likely traumatized four-year-old" who named her father as her rapist. See Marx v. Gumbinner, 905 F.2d at 1506. The district court correctly noted that the Marx court did not decide whether the uncorroborated statements of a four-year-old rape victim would constitute probable cause, but neither did the Marx court rule out a valid warrant based on such evidence alone.
 
 
 30
 Plaintiffs insist that Detective Davis relied on unqualified experts in determining that probable cause for search warrants existed. Plaintiffs have not, however, shown that Aldridge was unqualified, that Davis had reason to believe that she was unqualified, or that they have any basis for questioning Aldridge's competence other than that she came to a conclusion that they regarded as unfounded. None of these claims establishes lack of good faith or probable cause in the procurement of a search warrant.
 
 
 31
 Defendants argue that, based upon studies of child sexual abuse, the way the children related their accounts was very much in keeping with what was expected of them. The children's initial denial that any abuse occurred is not unusual, nor is the fact that the physical evidence was not dramatic.[7] Thus, the children's early reticence does not militate against a conclusion that the state officials acted with probable cause.
 
 
 32
 Plaintiffs also highlight the fact that the Lowes were enmeshed in a bitter divorce and custody battle. This contention carries little weight in the analysis. First, Defendant Aldridge presented substantial evidence that allegations of abuse leveled during divorce cannot be ignored merely because they are brought up in the heat of battle.[8] Second, in this case, Victoria Lowe initiated divorce proceedings because she feared that her husband was sexually abusing Alicia.
 
 
 33
 Plaintiffs allege that the defendants made materially false misstatements in the affidavit prepared for the search warrant. It appears that Detective Davis mistakenly attributed rectal scarring found on Darrell to have been found on Gary, but plaintiffs have produced no proof of any bad faith or misconduct on the part of the defendants in the reporting of the evidence in their possession.[9]
 
 
 34
 In short, we find that it was not objectively unreasonable for Detective Davis and Major Moody to procure a search warrant based on the evidence in their possession. Nor have we found any evidence of bad faith on the part of either Davis or Moody in the request for the search warrant.
 
 
 35
 The district court erred in concluding that genuine issues of material fact existed regarding the objective reasonableness of defendants Davis' and Moody's actions. We therefore hold that defendants had arguable probable cause for their actions and consequently were entitled to qualified immunity from section 1983 liability.
 
 C. Defendant Nancy Aldridge
 
 36
 In order to state a claim under section 1983, a plaintiff must "demonstrate that the party charged with the [constitutional] deprivation must be a person who may fairly be said to be a state actor. This may be because [she] is a state official, because [she] has acted together with or has obtained significant aid from state officials, or because [her conduct] is otherwise chargeable to the State." Lugar v. Edmondson Oil Co., 457 U.S. 922, 937, 102 S.Ct. 2744, 2753-54, 73 L.Ed.2d 482 (1982). When the defendant is an actual official of the state, such as a police officer or a government official, the inquiry is straightforward. In this case, however, the plaintiffs allege that the actions of Nancy Aldridge, a licensed therapist in private practice who has no official ties to Cobb County, its police department or its Department of Social Services, are "fairly attributable to the State."
 
 
 37
 As we said most recently in Harvey v. Harvey, "[o]nly in rare circumstances can a private party be viewed as a 'state actor' for Section 1983 purposes." 949 F.2d 1127, 1130 (11th Cir.1992). There are three primary tests for determining whether a private party can be considered a state actor: the public function test, the state compulsion test, and the nexus/joint action test. NBC v. Communications Workers of America, AFL-CIO, 860 F.2d 1022, 1026 (11th Cir.1988).
 
 
 38
 The public function test "covers only private actors performing functions 'traditionally the exclusive prerogative of the State,' " id., quoting Jackson v. Metropolitan Edison Company, 419 U.S. 345, 353, 95 S.Ct. 449, 454-55, 42 L.Ed.2d 477 (1974), and is inapplicable to this case.
 
 
 39
 The state compulsion test describes instances "in which the government has coerced or at least significantly encouraged the action alleged to violate the Constitution." NBC, 860 F.2d at 1026. In this case, however, the plaintiffs allege that Aldridge was a willing, if not leading, party in the events that led up to the alleged constitutional deprivation. Thus, the state compulsion test is also inapposite here.
 
 
 40
 The plaintiffs make vague allegations of a conspiracy between Aldridge on one hand, and Davis and Moody--who are obviously state actors for this purpose--on the other, thereby suggesting the type of symbiotic relationship between the government and a private party addressed by the nexus/joint action test. Id., 419 U.S. at 357, 95 S.Ct. at 456-57. The question here is whether "the State has so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in the enterprise." Jackson, 419 U.S. at 357-58, 95 S.Ct. at 456-57.
 
 
 41
 The facts presented by the plaintiffs, taken as true, do not support any allegation that Nancy Aldridge was anything except a private therapist hired by Victoria Lowe to treat the Lowe children. Aldridge previously had worked with abused children and testified in custody cases and cases involving child sexual abuse, but had no formal arrangement with the Cobb County Prosecutor's Office or any other governmental agency. Aldridge made a report of her suspicions of child abuse to the Division of Family and Child Services (DFACS), as required by law, but she was not required to contact the police department, and did not do so. In fact, it was Detective Davis who contacted Aldridge on April 27, 1987, at the suggestion of Victoria Lowe; during their conversation Aldridge simply reported the statements made to her by the Lowe children. Aldridge was also present during the videotaped interview of Alicia Lowe by Detective Davis, but careful review of the tapes makes clear that Aldridge played an insignificant role in the interviews. After these two interactions with Detective Davis, Aldridge devoted her time to treatment of the Lowe children. Her only other involvements with the court system were testifying at the divorce trial between Allan and Victoria Lowe, and at the probable cause hearing in Alpharetta, at which the criminal charges against Allan Lowe were dropped for lack of jurisdiction.
 
 
 42
 Plaintiffs allege that even if Aldridge were not a state actor herself, she acted in concert with state officials to deprive the plaintiffs of their rights. See Lugar v. Edmondson Oil Co., 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982); Bendiburg v. Dempsey, 909 F.2d 463 (11th Cir.1990). As we stated in Bendiburg, supra, and NAACP v. Hunt, 891 F.2d 1555, 1563 (11th Cir.1990), in order to prove such a conspiracy, a plaintiff must show that the parties reached an understanding to deny the plaintiff his or her rights. And, as discussed above, the constitutional right alleged to have been violated was the procurement of a warrant based on false statements made by Detective Davis. Thus, plaintiffs must provide some evidence of an "understanding" and "willful participation" between the private and state defendants toward the goal of procuring the warrant for the search of the Smith and Oakes homes. See Lugar v. Edmondson Oil, supra. Aldridge, however, played no role in the preparation of the affidavit in support of the search warrants by Detective Davis. It is also undisputed that Aldridge never knew of the existence of William or Anne Oakes prior to the search and thus could not have conspired to deprive them of their rights. For all of the foregoing reasons, Aldridge was not a state actor for section 1983 purposes, nor can she be considered to have acted in concert with state actors.
 
 
 43
 Even if Aldridge acted under color of state law, she would be entitled to qualified immunity along with Davis and Moody. As discussed above, plaintiffs would have to demonstrate that her actions violated clearly established constitutional law and a lack of good faith on Aldridge's part. The essence of plaintiffs' allegation is that Aldridge "coached" the children into creating increasingly fantastic tales of ritualistic and satanic sexual abuse and that she should have known that the abuse could not have taken place. Although it is unclear what exactly happened to these children, the fact that those stories detailed unremitting horror cannot be held as evidence of their untruth.
 
 
 44
 We cannot judge the truth or falsity of the allegations of sexual abuse of the Lowe children or the method of their therapist in eliciting their stories. We deal here only with whether the constitutional rights of the plaintiffs were violated by the actions of Aldridge in taking seriously the Lowe children's accounts, and the actions of Davis and Moody in procuring a warrant to search for evidence that would corroborate their claims.
 
 
 45
 Aldridge has presented substantial evidence that there exists no definitive standard for treating child sexual abuse, or establishing a rapport with young patients, or eliciting their stories. We have no way of judging such behavior, and, more important, such a claim has no part in this federal suit alleging violations of constitutional rights.
 
 
 46
 A careful review of the record shows that there is no evidence that Aldridge was either a state actor or a private party working in concert with the police, or indeed that she was not entitled to qualified immunity if she was a state actor.[10] It was thus error to deny her motion for summary judgment.
 
 IV. CONCLUSION
 
 47
 We are unwilling to hold that it is improper to rely on explicit, detailed allegations of sexual abuse made by three children because of conflicting physical evidence or because the stories seem too horrible to believe. Nancy Aldridge acted solely in her capacity as a private therapist to the children and as their sole advocate in a bitter legal battle sparked by accusations that Allan Lowe had sexually molested his daughter. We hold that Detective James Davis and Major Sharon Moody did not violate the rights of the plaintiffs in procuring a warrant to search the Smith and Oakes home, and that Nancy Aldridge was not a state actor under 42 U.S.C. § 1983. Accordingly, the district court erred in denying their motions for summary judgment.
 
 
 48
 REVERSED and REMANDED with instructions to grant summary judgment for the defendants.
 
 
 
 [1]
 As discussed infra, Alicia did not actually identify the Oakes as participants in the abuse; she merely identified their house as a place where she and her brothers had been abused. Detective Davis subsequently discovered that the house identified by Alicia was owned by the Oakes and named the Oakes in the search warrant
 
 
 [2]
 Peggy Lowe had been visiting the Smiths at the time of the search and Allan Lowe had been living there for a number of months
 
 
 [3]
 The two lawsuits remain separate cases but were calendared together during oral argument and are sufficiently similar in facts and law to merit joint disposition
 
 
 [4]
 The youngest child, Gloria, was not alleged to have been abused
 
 
 [5]
 It appears that the Lowe divorce was made final during February of 1988, but the ultimate decision regarding custody and visitation rights is not clear. It is clear, however, that after criminal charges against Allan Lowe were dropped, Victoria Lowe was convinced, rightly or wrongly, that her children were not safe. In August of 1988, Victoria Lowe violated a Cobb County court order and fled with her children. Neither she nor her children have been seen since that time
 
 
 [6]
 The district court used essentially the same language in denying the defendants' claim of qualified immunity in Oakes v. Davis, the companion case to Lowe. See Oakes Order at 14
 
 
 [7]
 See, e.g., Muram, Child Sexual Abuse: Relationship Between Sexual Acts and Genital Findings, Child Abuse and Neglect, Vol. 13, pp. 211-216 (1989)
 
 
 [8]
 See, e.g., Breese, et al., Allegations of Child Sexual Abuse in Child Custody Disputes: A Therapeutic Assessment Model, 56(4) Amer. J. Orthopsychiat., Oct. 1986, 560 ("Our experiences indicate that while some such charges are the result of distortion, misinterpretation, overreaction, or hysteria (if not outright lying) on the part of the reporting parent, when the allegations are repeated and confirmed by the statements or conduct of the child, they should not be discounted simply because of domestic conflict.")
 
 
 [9]
 In their complaint, the Oakes also allege that Victoria Lowe had previously helped Alicia find their house, that Aldridge knew of this effort, and that therefore Alicia's "identification" of the house store as the Oakes' home was tainted and the product of a conspiracy with Aldridge. This allegation, even if true, does not support any claim of misconduct on the part of Davis and Moody
 
 
 [10]
 Because we hold that Aldridge was not a state official for the purpose of section 1983, we do not address the question, raised by Aldridge and several amici, of whether O.C.G.A. § 19-7-5, which mandates the reporting of suspicions of child abuse and neglect, would provide Aldridge with absolute immunity for actions taken pursuant to that statute