671 So.2d 166 (1996)
Major Ronald WALSINGHAM, individually, and Robert V. Kriegel, individually, Petitioners,
v.
Denzel DOCKERY; Ruth Dockery; Vortex Spring, Inc., a Florida corporation, and Vortex Innerspace Products, Inc., a Florida corporation, Respondents.
No. 95-893.
District Court of Appeal of Florida, First District.
February 21, 1996.
Rehearing Denied April 24, 1996.
*168 Cynthia S. Tunnicliff, Davisson F. Dunlap, Jr. and Darren A. Schwartz of Pennington & Haben, P.A., Tallahassee, for Petitioners.
David K. Miller of Broad and Cassel, Tallahassee, for Respondents.
JOANOS, Judges.
By petition for a writ of common law certiorari, petitioners seek review of a circuit court order denying their motion for summary judgment with respect to section 1983 claims asserted against them in their individual capacities. Petitioners maintain they are entitled to qualified immunity from suit on plaintiffs'/respondents' claims that they were responsible for an unreasonable search and unlawful arrest. We agree, and reverse the denial of petitioners' motion for summary judgment with respect to the section 1983 claims asserted against them in their individual capacities.
The basic facts are not in dispute. Respondents Denzel and Ruth Dockery own and reside at Vortex Springs in Holmes County, Florida. The property includes 290 acres on which is situated a restaurant, the Dockery residence, the home and office of Joe Van Wagoner, a campground, and a dive shop/welding shop area. Respondent Vortex Spring, Inc. (Vortex) is a natural spring attraction. Petitioner Walsingham is an officer of the Florida Game and Freshwater Fish Commission (GFC), in command of the Northwest Region, and was in charge of the criminal investigation which gave rise to this action. During the relevant time period, petitioner Kriegel was the official in charge of the Northwest Florida District of the Department of Environmental Regulation (DER), and was the DER supervisor involved in DER's investigation and participation in GFC's investigation of respondents.
In February 1990, Jack Boos, former employee of Vortex, reported to GFC that Mr. Dockery and several Vortex employees participated in dumping chemicals in the burn pits on Vortex property. On February 5, 1990, GFC officers Scott Runkle and Jempsey *169 Owen interviewed Mr. Boos. Mr. Boos told officers he previously had been employed at Vortex for four years. He terminated his employment in November 1989, because he believed unsafe conditions were posed by virtue of the use and storage of numerous chemicals on the property. Although Mr. Boos did not know the names of all the chemicals in use at Vortex, he listed defoliants, herbicides, pesticides, methyl ethyl ketone, formaldehyde, hydrochloric and sulfuric acids, and xylene, most of which came from military bases. Mr. Boos told Officers Runkle and Owen that the chemicals were disposed of in trash pits located between Otter Creek and the spring on Mr. Dockery's property. Generally, chemicals in old containers were thrown into the trash pit until there was a general build-up of debris from the campsites and shop, at which time all of the trash, including the chemicals, would be burned. Mr. Boos also said there were four or five other burn pits on the property that had been covered with fresh fill dirt. In addition, Mr. Boos described a pipe at the camping area for motor home/travel trailer use, through which raw sewage was permitted to flow into Otter Creek.
Officers Runkle and Owen drove to Vortex Springs, where an employee permitted them to enter. The officers observed an active burn pit on fire and exuding black smoke, together with cranes, backhoes, and numerous chemical drums stretching for 75 to 100 yards up and down the creek. Many of the chemical containers were leaking fluid onto the ground. The officers also observed two signs above the spring near the camping area, which read: "Dump Station" and "Not potable water," and a pipe running out of the ground.
On February 6, 1990, the day after his initial interview with Mr. Boos, Lieutenant Runkle contacted the Atlanta office of the Environmental Protection Agency (EPA) and asked for advice and assistance with the case. EPA suggested that he contact the DER Hazardous Waste Section and proceed from there. Lieutenant Runkle did not think Mr. Boos' initial statements constituted probable cause to conduct a search of the Vortex premises, although he felt the statements reflected an honest concern.
Shortly after the initial Boos interview, Major Walsingham of GFC contacted Mr. Kriegel of DER, to secure DER's technical assistance in determining whether hazardous waste had been disposed of on the Vortex property. A few days later, Sergeant Owen contacted State Attorney Allen Register, to advise that he and Lieutenant Runkle were investigating Vortex Springs property concerning potential illegal disposal of hazardous waste, raw sewage, and illegal dredge and fill. As the investigation continued, Officers Runkle and Owen periodically reported to State Attorney Register and James Knight, a GFC attorney, in addition to seeking technical assistance from DER personnel.
On February 14, 1990, GFC officers Runkle and Owen met at the state attorney's office with State Attorney Register, GFC attorney Knight, Major Walsingham, and Jack Boos, where the state attorney interviewed Mr. Boos. During that interview, Mr. Boos stated that formaldehyde had been dumped in the burn pits. In a later sworn deposition, Mr. Boos confirmed that he told the state attorney formaldehyde was being put in the burn pits at Vortex. Mr. Boos explained he was concerned about the numerous chemicals stored on Vortex property, the putrid smell, and the fact that deteriorated chemical containers were dumped into the burn pits and into the water. He called GFC, because he concluded the game wardens would be able to stop these activities.
On February 14, 1990, GFC officers interviewed Ron Dragula, another former employee of Vortex.[1] Mr. Dragula told officers that
methaketone was there, I saw formaldehyde the formaldehyde containers were all plastic bottles, they were kind of sunbaked, cracking and leaking[.] Acetone in little plain brown military type cans, you know what I am saying, there were all rusted out and leaking. Hydrochloric acid, sulfuric *170 acid and muriatic acid were all in glass jugs and plastic jugs and stored out in the front where anybody could get to them.
On February 15, 1990, Officers Runkle and Owen obtained a sworn statement from Mr. Davis, who has been an employee at Vortex Springs since 1980. Mr. Davis told officers that present on the property were such chemicals as ether in gallon containers, weed killers, paint remover, trichloroethene, mercury, denatured alcohol, and methylethylketone. Mr. Dockery bought many of these materials at military sales. Mr. Davis told the officers that many of the containers were labeled "Hazardous Chemicals." According to Mr. Davis, any chemicals that could not be used were poured into a 55-gallon drum and burned, and the drum was then squashed and buried in the dump on Vortex property. Mr. Davis confirmed the existence of at least five dumps, all located between two creeks.
Mr. Van Wagoner, manager of Vortex and a 17-year employee, also gave a sworn statement on February 15, 1990. He listed such chemicals as sulfuric acid, hydrochloric acid, ether, mercury, Naptha, and trichloromethane as present on the Vortex Springs property. Mr. Van Wagoner invited the officers to walk around the property. In a later deposition, Mr. Van Wagoner said some of the 55-gallon containers at the dump site still had chemicals in them, but he did not know what chemicals were there.
Lieutenant Runkle said he did not accept Mr. Van Wagoner's offer to walk around the property, because it was made so late in the day that the two officers would have been unable to obtain sufficient manpower to conduct a thorough search at that time. Lieutenant Runkle further stated that in a consent search, the property owner could limit the extent of the search or curtail it at any time. The officer was concerned that evidence would be moved or covered over with fill dirt. He noted that Mr. Dockery had a tremendous amount of equipment that could be used for dredging and filling.
In an affidavit, State Attorney Register stated he had worked with Officer Owen on several prior occasions. Sergeant Owen contacted the state attorney during the first two weeks of February 1990, about a hazardous waste investigation he was conducting at Vortex Springs. Mr. Register confirmed that he personally interviewed Mr. Boos before February 16, 1990,[2] and found his testimony concerning the dumping of hazardous chemicals in burn pits on the Dockery property to be credible. Mr. Register suggested that GFC officers attempt to verify Mr. Boos' statements by interviewing additional witnesses and obtaining additional information and documentation.[3] Mr. Register drafted the affidavit and search warrant for presentation to a circuit judge, and accompanied attorney Knight and Lieutenant Runkle to *171 the judge's office. The judge read the affidavit, placed Lieutenant Runkle under oath, and inquired as to the staleness of the information in the affidavit. Upon being advised that the activity described in the affidavit was ongoing in nature, the judge again reviewed the affidavit, then issued the warrant.
During execution of the search warrant, GFC received an anonymous tip that Mr. Dockery's employees would attempt to remove a drum of chemicals located in the woods. Major Walsingham instructed Lieutenant Runkle to post another officer on the scene through the week-end, and to advise that officer concerning the tip. Later, Mr. and Mrs. Dockery approached officers posted in the pit area and stated they needed to remove a barrel of detergent in the woods. Lieutenant Runkle said that earlier, officers had located a 55-gallon drum in the edge of the woods; the drum was leaking a red fluid.
DER contracted with a private firm to do soil testing and sampling from hazardous waste sites. On Monday, March 12, 1990, this firm provided initial test results to DER, which indicated unacceptable levels of chromium and lead present in the burn pits. DER then furnished the test results to GFC. On March 20, 1990, Sergeant Owen arranged to meet Mr. Dockery and his attorney at the Holmes County Jail. Mr. Dockery then was charged with one count of dumping litter defined as hazardous waste under section 403.413, Florida Statutes. In a separate information, Mr. Dockery was charged with the misdemeanor offense of "deposit of deleterium substance, to wit: raw sewage" into the fresh waters of the state.
Subsequently, an environmental consultant retained by Mr. Dockery called the laboratory and learned that the appropriate testing had not been performed. The consultant did not notify GFC or DER of the problem with the test results. Thus, DER was unaware that the data did not include EPA toxicity analyses for the twenty-six samples collected by the private firm, until a meeting between the parties on May 25, 1990. After that meeting, GFC officers asked the state attorney to dismiss the felony hazardous waste charge against Mr. Dockery.
An order denying a defendant's motion for summary judgment is an immediately appealable collateral order where: (1) the defendant is a public official asserting a defense of "qualified immunity," and (2) the issue appealed concerned whether certain given facts showed a violation of clearly established law. Johnson v. Jones, 515 U.S. ___, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995); Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985). The qualified immunity of public officials involves immunity from suit, rather than a mere defense to liability. Since the entitlement is lost if a case is erroneously permitted to go to trial, "an order denying summary judgment based upon a claim of qualified immunity is subject to interlocutory review to the extent that the order turns on an issue of law." Tucker v. Resha, 648 So.2d 1187, 1190 (Fla.1994), citing Mitchell v. Forsyth. See also Jordan v. Doe, 38 F.3d 1559, 1563 (11th Cir.1994) ("the issue of a government official's qualified immunity from suit presents a question of law").
The test for qualified immunity was established in Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396, 410 (1982), where the Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." See also Lassiter v. Alabama A & M University, 28 F.3d 1146, 1149 (11th Cir.1994). The court making the determination first must determine whether the plaintiff has asserted a constitutional right. If plaintiff has done so, the court then must determine whether the constitutional right is "clearly established." Jordan v. Doe, 38 F.3d at 1564. "[O]nly in exceptional cases will government actors have no shield against claims made against them in their individual capacities." Lassiter, 28 F.3d at 1149.
In Zeigler v. Jackson, 716 F.2d 847, 849 (11th Cir. 1983), the eleventh circuit adopted a two-part analysis for applying the Harlow test: first, the defendant government official must prove that he was acting *172 within the scope of his discretionary authority when the allegedly wrongful acts occurred. Once the official establishes this element, the burden shifts to plaintiff to demonstrate that the defendant violated clearly established constitutional law. See also Jordan v. Doe, 38 F.3d at 1565; Sammons v. Taylor, 967 F.2d 1533, 1538-39 (11th Cir.1992); Lowe v. Aldridge, 958 F.2d 1565, 1570 (11th Cir.1992). "Discretionary authority" includes all actions of a public official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority. Jordan v. Doe, 38 F.3d at 1566.
"[P]roper application of the Harlow test also requires a determination of whether the showings made by the parties create a genuine issue of material fact as to whether the defendant actually engaged in conduct that violated the clearly-established law. Both of these determinations go to questions of law that are subject to de novo review." Rich v. Dollar, 841 F.2d 1558, 1563 (11th Cir.1988). See also Kelly v. Curtis, 21 F.3d 1544, 1550 (11th Cir.1994) (appellate court will "review de novo the legal basis for a [trial court's] denial of summary judgment on qualified immunity, viewing the facts in the light most favorable to the plaintiff").
An arrest [or search] without probable cause violates the Fourth Amendment and establishes a cause of action under section 1983. Lowe v. Aldridge, 958 F.2d at 1570; Marx v. Gumbinner, 905 F.2d 1503, 1504 (11th Cir.1990). The question is whether reasonable public officials in the same circumstances and possessing the same knowledge as the defendants could have believed that probable cause existed. See Lowe v. Aldridge, 958 F.2d at 1570. To establish probable cause, defendants are required to show only that they had reason to believe that a crime had been committed and that evidence would be found at the premises to be searched. Id. "Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable will the shield of immunity be lost." Malley v. Briggs, 475 U.S. 335, 344-45, 106 S.Ct. 1092, 1098, 89 L.Ed.2d 271 (1986). See also Marx v. Gumbinner, 905 F.2d 1503, 1506 (11th Cir.1990); Von Stein v. Brescher, 904 F.2d 572, 578 (11th Cir.1990). The existence of probable cause is based on objective standards. Harlow v. Fitzgerald, 457 U.S. at 818, 102 S.Ct. at 2738, 73 L.Ed.2d at 410. Actual probable cause is not necessary for an arrest to be objectively reasonable, since it is inevitable that there will be cases where law enforcement officials will reasonably, but mistakenly, conclude that probable cause is present. In such cases, "those officials should not be held personally liable." Anderson v. Creighton, 483 U.S. 635, 641, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523, 531 (1987); Von Stein v. Brescher, 904 F.2d at 579.
An officer seeking an arrest warrant does not have an affirmative obligation to seek out exculpatory information of which the officer is not aware. Kelly v. Curtis, 21 F.3d 1544, 1551 (11th Cir.1994). However, qualified immunity does not protect an officer who seeks a warrant where "a reasonably well-trained officer ... would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." Malley v. Briggs, 475 U.S. 335, 345, 106 S.Ct. 1092, 1098, 89 L.Ed.2d 271 (1986); Kelly v. Curtis, 21 F.3d at 1553. If officers of reasonable competence could disagree as to whether a warrant should issue, "immunity should be recognized." Malley v. Briggs, 475 U.S. at 341, 106 S.Ct. at 1096.
A supervisor can be held liable under section 1983 when a reasonable person in the supervisor's position would have known that his conduct infringed the constitutional rights of the plaintiff, and his conduct was causally related to the constitutional violation committed by his subordinate. Greason v. Kemp, 891 F.2d 829, 836 (11th Cir.1990). A determination of supervisor liability requires application of a three-part test: (1) whether the supervisor's failure to adequately train and supervise subordinates involved deliberate indifference, (2) whether a reasonable person in the supervisor's position would know that his failure to train and supervise reflected deliberate indifference, and (3) whether his conduct was causally related to the constitutional infringement of his subordinate. Id. at 836-37. See also *173 Wright v. Sheppard, 919 F.2d 665 (11th Cir. 1990); Brown v. Crawford, 906 F.2d 667 (11th Cir.1990), cert. denied, 500 U.S. 933, 111 S.Ct. 2056, 114 L.Ed.2d 461 (1991).
There is no dispute in this case that plaintiffs/respondents asserted a clearly established constitutional right, or that defendants/petitioners were acting within the scope of their discretionary authority when the allegedly wrongful acts occurred. At that point, the burden shifted to plaintiffs/respondents to demonstrate that defendants Walsingham and Kriegel engaged in conduct that violated clearly established law. Respondents failed to meet that burden.
Although respondents assert the affidavit contained serious omissions and misrepresentations, the record reflects the only omission of consequence concerned the relative inexperience of the investigating officers in the specific field of environmental enforcement. The initial information concerning the possibly improper disposal of hazardous waste came from a former employee who made no secret of his dislike of Mr. Dockery, or of the fact that he was unemployed when he contacted GFC. The day after his first contact with Jack Boos, Lieutenant Runkle contacted the EPA in Atlanta, and was advised to work with DER. Lieutenant Runkle and Sergeant Owen confirmed Mr. Boos' information in part by their own visual inspection of the premises. The Boos information also was corroborated in some respects by Ron Dragula, another former employee of Vortex, and by current employees Joe Van Wagoner and Lloyd Davis. In addition, Lieutenant Runkle obtained lists of chemicals Mr. Dockery purchased from military bases, and ascertained that Mr. Dockery had not obtained authorization to dispose of hazardous waste at a hazardous waste facility. In the early stages of the investigation, officers sought advice and guidance from State Attorney Register and GFC counsel. The State Attorney personally interviewed Jack Boos and found him to be credible.
When this investigation took place, Lieutenant Runkle's training in hazardous waste disposal consisted of eight hours of instruction. Despite his lack of technical training, Lieutenant Runkle held a bachelor's degree in criminology, and was an experienced wildlife officer who had made prior arrests for violations of Chapter 403. He was familiar with the list of hazardous chemicals, and recognized that some of the chemicals allegedly dumped in the Vortex Springs burn pit were classified as hazardous materials.
The environmental enforcement unit of GFC had been in operation only a few months when the events giving rise to this petition occurred. In such circumstances, Major Walsingham reasonably should have perceived a need to provide specialized training for his officers. However, it would be difficult to attribute Lieutenant Runkle's minimal specialized training in hazardous waste violations to Major Walsingham's deliberate indifference. Rather, the more likely conclusion was that any deficiency in training could be attributed to the recent creation of the unit. The sharing of information and expertise between GFC and DER, now included within the Department of Environmental Protection, together with consultations with the State Attorney and staff counsel, indicates these public officials alleviated any training deficiencies by the care in which they approached the decision to seek a search warrant, and that they acted with objective reasonableness in concluding probable cause was present.
The record reflects that the material facts concerning the availability of the qualified immunity defense are undisputed. Therefore, the existence of probable cause was a question of law to be decided by the court. Since it appears the facts and circumstances known to the public officials were such that a person of reasonable caution would believe a crime was being committed, the motion for qualified immunity summary judgment should have been granted.
Accordingly, we grant the writ, quash the circuit court's ruling as to the qualified immunity issue, and remand with directions to enter an order granting summary judgment to petitioners on the basis of their qualified immunity from suit in their respective individual capacities.
MICKLE and LAWRENCE, JJ., concur.
NOTES
[1] Mr. Boos had told the officers that Ron Dragula could provide information about the burn pits at Vortex.
[2] The affidavit for a search warrant was prepared on February 16, 1990.
[3] Mr. Register's affidavit states in part:

6. After fully discussing the facts of the case with Jempsey Owen, Scott Runkle, Ronald Walsingham, and Jim Knight, reviewing aerial photographs of the property, and after further interviews of Vortex employees were conducted prior to February 16, 1990, I came to the conclusion that, based on the totality of the evidence, there was probable cause for the issuance of a search warrant. That point of view was also shared by Jempsey Owen, Scott Runkle, Ronald Walsingham, and Jim Knight prior to applying for a search warrant.
. . . .
12. It was my opinion the evidence gathered during the course of the investigation conducted by the GFC and DEP established probable cause for both the search warrant and subsequent arrest of Mr. Dockery. The evidence I was made aware of up to the point I advised the GFC officers to proceed and arrest Mr. Dockery included aerial photographs of the property, witness interviews of Vortex employees, military records showing Mr. Dockery's purchases of hazardous chemicals, and test results by DEP's hazardous waste contractor. I also personally observed the Vortex property prior to Mr. Dockery's arrest and found the property to be littered with junk and barrels of chemical containers, consistent with the information that had been presented to me by the GFC officers. It appeared to me therefore, that the facts available at the time the search warrant was issued and the arrest was made indicated that there was a potentially disastrous environmental problem that needed immediate attention. I believe that the GFC officers had sufficient probable cause to believe a crime had been committed on the property, and that they acted properly in obtaining the search warrant and arresting Mr. Dockery for illegally disposing of hazardous waste on the property.